# Illinois Official Reports

## Appellate Court

***People v. Escort*, 2017 IL App (1st) 151247**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL ESCORT, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-15-1247 |
| Filed | November 22, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-521; the Hon. Kevin M. Sheehan, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Robert Hirschhorn, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Joseph Alexander, and Tilesha Northern, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion.<br>Justices Connors and Delort concurred in the judgment and opinion. |

**OPINION**

¶ 1    The defendant, Michael Escort, was convicted of murder and sentenced to 60 years' imprisonment. He now appeals, arguing, *inter alia*, that he was not proven guilty beyond a reasonable doubt. For the reasons that follow, we reverse the defendant's conviction and sentence.

¶ 2    The following facts are taken from the evidence introduced by the State at the defendant's trial. On October 3, 1989, Mary Smith (hereinafter also referred to as the victim) was found dead in the courtyard of an abandoned warehouse located at 5801 South Lowe Avenue in Chicago. When found, she was naked, and articles of her clothing were found on the roof of the building. Mary Smith's death was treated as a homicide, but the initial investigation failed to result in any arrest.

¶ 3    In July 2011, the Chicago police department submitted swabs taken from the victim's body and articles of her clothing to Cellmark Forensics in Dallas, Texas, for biology and DNA testing and the development of DNA profiles suitable for comparison with known DNA profiles of individuals in a national database. Cellmark Forensics received two vaginal swab sticks, two rectal swab sticks, and two oral swab sticks. The cotton parts of those swabs had been separated and were also received by Cellmark Forensics. The swab sticks and actual cotton swabs were tested for sperm cells. Sperm cells were detected on the vaginal and rectal swab sticks as well as on both the vaginal and rectal cotton swabs, but not on the oral swab sticks. The testing revealed many sperm cells on the swabs taken from the victim's vagina, which, according to the testimony of a forensic casework supervisor employed by Cellmark Forensics, was indicative of a recent encounter. Fewer sperm cells were detected on the swabs taken from the victim's rectum. DNA analysis was performed on the swab sticks and the cotton swabs. The material was divided into two samples: sperm and non-sperm. The analysis conducted on the non-sperm fraction of the material on the vaginal swab sticks revealed a partial predominant DNA profile for a male identified as "unknown male number 1." The analysis of the sperm fraction of the material from the vaginal swab sticks also revealed a partial predominant DNA profile for a male identified as unknown male number 1. No other profiles suitable for comparison were detected from the vaginal swab sticks. The analysis of the non-sperm fraction of the material from the vaginal swabs revealed a partial DNA profile consistent with the victim's profile. Analysis of the sperm fraction of the material from the vaginal swab revealed a complete DNA profile for unknown male number 1. The rectal swab sticks and the rectal swabs were combined into one sample for DNA analysis. The analysis of the non-sperm fraction produced a DNA profile consistent with the victim's profile, but no DNA profile was obtained from the sperm fraction. Semen was found in the crotch area of pants that were recovered from the roof of the warehouse. Analysis of both the sperm fraction and the non-sperm fraction from the semen stain produced DNA profiles consistent with a male identified as "unknown male number 2," but inconsistent with that of unknown male number 1. Analysis was also done on the semen stains on the victim's panty hose. Examination of the non-sperm fraction of the semen on the crotch area of the victim's panty hose revealed that it was from two people, including at least one unknown male. However, no conclusion could be drawn from that analysis as to whether either unknown male number 1 or unknown male number 2 was a contributor. Analysis of the sperm fraction revealed that three individuals were the source. However, again no conclusion could be drawn from that analysis as to

whether either unknown male number 1 or unknown male number 2 was a contributor. The results of the testing conducted by Cellmark Forensics were reported to the Chicago police department and also furnished to the Illinois State Police crime laboratory.

¶ 4       The Illinois State Police conducted a comparison of the unknown male DNA profiles that were developed by Cellmark Forensics with known profiles in a national database. The comparison revealed an association between the DNA profile of unknown male number 1, developed from the analysis of the victim's vaginal swabs, and the defendant's known profile.

¶ 5       After being informed of the association between the defendant's known DNA profile and the DNA profile for the unknown male number 1, Chicago police detectives located the defendant and, with his agreement, took DNA swabs from his cheeks and lower lip. Those swabs were sent to the Illinois State Police crime laboratory for analysis and comparison with the DNA profiles developed from the swabs from the victim's body. The comparison revealed that the DNA profile identified from the sperm fraction of the victim's vaginal swab matched the defendant's DNA profile. The comparison also revealed that the defendant was a contributor to both the sperm fraction and the non-sperm fraction of the samples from the vaginal swabs and the vaginal swab sticks. The defendant's DNA profile was not found in the sample from the semen stain on the victim's pants. The comparison of the defendant's DNA profile with the non-sperm fraction of the sample from the victim's panty hose yielded insufficient information to either include or exclude the defendant as a contributor. The defendant's DNA was not found on the sperm fraction of the sample from the panty hose, and he could, therefore, be excluded as a contributor.

¶ 6       On December 6, 2012, the defendant was arrested, and on January 3, 2013, he was charged by indictment with four counts of murder arising from the death of Mary Smith. One of the four counts was based upon felony murder for which the predicate felony was criminal sexual assault. The defendant elected to be tried by a jury.

¶ 7       Prior to trial, the State filed a motion seeking leave of court to introduce proof that the defendant had two prior convictions for aggravated criminal sexual assault. In support of its motion, the State invoked section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2012)). The trial court granted the motion, finding that the probative value of the propensity evidence outweighed its prejudicial impact. However, at trial, the State elected to introduce evidence of only one of the defendant's prior convictions; namely, the 1991 aggravated criminal sexual assault on T.P., the 13-year-old daughter of the defendant's then-girlfriend.

¶ 8       The defendant's trial commenced on December 1, 2014. Harold Smith, the victim's brother, testified that the victim was addicted to drugs and had been working as a prostitute. On the evening of October 2, 1989, he and the victim went to a "drug house" where they used crack cocaine. According to Harold, he sent the victim to buy additional drugs. When she did not return, he went looking for her. Harold testified that he saw the victim from a distance; she waved and said that she would be back. He stated that this was the last time that he saw the victim alive.

¶ 9       The State called the following individuals as witnesses: Officer Carl Brasic, a forensic investigator; Detective Denise Trouche, a serologist; Robert Berk, a trace evidence analyst employed by the Illinois State Police; Kelli Byrd, a forensic casework supervisor employed by Cellmark Forensics; Officer Edward Carroll from the cold case unit of the Chicago police department; and Ryan Paulsen, a forensic scientist employed by the Illinois State Police. These

individuals testified to the gathering of evidence at the location where the victim was found, the fact that swabs were taken from the victim's body, the submission of those swabs and articles of the victim's clothing for analysis, the results of that analysis, the association found between the DNA profile developed from material from the vaginal swabs and vaginal swab sticks and the defendant's known profile, the collection of comparison swabs from the defendant's cheeks and lower lip, and the comparison of the DNA profile developed from the swabs taken from the defendant with the DNA profiles developed from the victim's vaginal swabs and vaginal swab sticks.

¶ 10    The State also called Dr. Steven Cina, a forensic pathologist with the Cook County medical examiner's office, as a witness to testify to the findings of the autopsy, which was performed on the victim's body on October 3, 1989. Dr. Cina testified that the condition of the victim's body when initially examined indicated that she had not been dead very long as there was no evidence of rigor mortis, livor mortis, or stiffening of any of her muscles or joints. According to Dr. Cina, the victim had only been dead for several hours. He stated that the autopsy revealed that the victim sustained multiple injuries to her head and neck. Hemorrhaging beneath her scalp was noted, indicating blunt force trauma to the head. Also noted were extensive fractures to the bony plate above the victim's left eye socket. Dr. Cina was of the opinion that the extensive abrasions on the right side of the victim's head were caused by a rough heavy object. The injuries to the victim's neck consisted of abrasions and bruising to the lateral structures, which were associated with internal injuries. Dr. Cina testified that the victim suffered a fracture of the laryngeal cartilage and a fracture of the hyoid bone; injuries typically associated with strangulation. There were minor injuries to the victim's chest, and on her back were large abrasions, which were compatible with her body having been dragged over a rough surface. Dr. Cina testified that no injuries were found on the victim's vagina or anus. He was of the opinion that the victim died of strangulation and that the blunt force injuries to her head were a contributing cause.

¶ 11    As its final witness, the State called T.P. She testified to the facts surrounding the defendant's sexual assault upon her in 1991. She stated that, in the course of the attack, the defendant choked her.

¶ 12    Following T.P.'s testimony, the State rested. Thereafter, the defendant moved for a directed verdict of not guilty, arguing that the State's evidence proved only that he had sexual relations with the victim but not that he had murdered her. The trial court denied the defendant's motion, and the defendant then rested without introducing any evidence.

¶ 13    Following their deliberations, the jury found the defendant guilty of murder. The trial court denied the defendant's posttrial motion and subsequently sentenced him to 60 years' imprisonment. Following the denial of the defendant's motion for reconsideration of his sentence, he filed the instant appeal.

¶ 14    In urging reversal of his conviction and sentence, the defendant argues, *inter alia*, that the State failed to prove him guilty of Mary Smith's murder beyond a reasonable doubt. According to the defendant, the State proved only that he was one of several men who had sexual relations with the victim prior to her death. In response, the State argues that the circumstantial evidence introduced at trial was sufficient to establish the defendant's guilt beyond a reasonable doubt.

¶ 15    When, as in this case, a defendant challenges the sufficiency of the evidence supporting a conviction, we must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Brown*, 2013 IL 114196, ¶ 48. "This standard of review applies in all criminal cases whether the evidence is direct or circumstantial." *People v. Ehlert*, 211 Ill. 2d 192, 202 (2004).

¶ 16    In this case, there is no direct evidence linking the defendant to the death of the victim. Nevertheless, "[c]ircumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Hall*, 194 Ill. 2d 305, 330 (2000).

¶ 17    As a reviewing court, we will not reverse a criminal conviction "unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of [the] defendant's guilt." *People v. Collins*, 214 Ill. 2d 206, 217 (2005). However, if, after an examination of the evidence, we conclude that the evidence is so unsatisfactory or inconclusive that it creates a reasonable doubt of the defendant's guilt, we must reverse the conviction. *People v. Smith*, 185 Ill. 2d 532, 541-42 (1999).

¶ 18    Proof of any criminal offense requires proof of two concepts: "first, that a crime occurred, *** and second, that it was committed by the person charged." *Ehlert*, 211 Ill. 2d at 202. In this case, the State clearly proved that Mary Smith was murdered. The issue presented is whether the evidence introduced by the State was sufficient to establish, beyond a reasonable doubt, that the defendant committed the murder.

¶ 19    The State argues that the evidence in this case supports the inference that the defendant was the last person to see the victim alive. In support of its conclusion in this regard, the State notes that (1) the defendant had sexual relations with the victim as evinced by his DNA profile on the sperm and non-sperm samples from victim's vaginal swabs and the swab sticks, (2) the quantity of the defendant's sperm cells on the vaginal swab indicates a recent encounter, and (3) Dr. Cina's opinion that the victim had only been dead for several hours when her body was first examined on the morning of October 3, 1989. Based on these facts, the State also contends that a reasonable trier of fact could infer that the defendant had sexual relations with the victim shortly before her death. The State next asserts that, since the defendant's DNA was not found on the victim's panty hose, the trier of fact could also infer that the victim did not have an opportunity to put her panty hose back on after having sex with the defendant. From these facts, the State concludes that a reasonable trier of fact could find, beyond a reasonable doubt, that the defendant murdered Mary Smith.

¶ 20    We find several flaws with the State's reasoning. First, the fact that Kelli Byrd, the forensic casework supervisor employed by Cellmark Forensics, testified that the "many, many sperm cells" present on the victim's vaginal swab "would indicate a more recent encounter," does not support the conclusion that, because the defendant's DNA profile was found on these sperm cells, he had sexual relations with the victim shortly before her death. In fact, Byrd testified both that semen can remain in a woman for up to 72 hours after sexual intercourse and that there is no way of telling when DNA is deposited on a person. Although the fact that sperm cells containing the defendant's DNA profile were found in a great quantity on the victim's vaginal swab and the vaginal swab sticks may well support a reasonable inference that the defendant had sexual relations with the victim after the other individuals whose DNA was detected on the swabs taken from the victim's body, that fact does not establish a temporal link between the defendant's sexual encounter with the victim and the time of her death. Dr. Cina opined that the victim had only been dead for several hours before her body was first examined, but he rendered no opinion as to the time that elapsed between the victim's last

sexual encounter and her death. As for the analysis of the victim's panty hose, Byrd testified that the Cellmark Forensics analysis could not support a conclusion as to whether unknown male number 1, now known to be the defendant, was a contributor to the sperm or non-sperm fractions of the samples analyzed. Although Ryan Paulsen testified that, based upon the comparison analysis performed at the Illinois State Police crime laboratory, the defendant could be excluded as a contributor to the sperm fraction of the sample taken from the victim's panty hose, he also stated that the defendant could neither be included nor excluded as a contributor to the non-sperm fraction of the sample.

¶ 21    Distilled to its finest, the State's evidence could reasonably support only a determination that the defendant had sexual relations with the victim at some time during the 72-hour period prior to her death. It would be pure speculation to conclude that the defendant and the victim had sexual relations shortly before her death or that he was the last person to see the victim alive. However, guilt may not rest on speculation. *People v. Martin*, 26 Ill. 2d 547, 551 (1963).

¶ 22    Our examination of the record in this case leads us to conclude that the evidence introduced by the State was so weak as to create a reasonable doubt on the issue of whether the defendant committed the murder of Mary Smith. Consequently, we reverse the defendant's conviction and sentence and, therefore, find no need to address any of his other claims of error.

¶ 23    Reversed.