2020 IL App (1st) 163173-U

No. 1-16-3173

Order filed September 8, 2020

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 3851 |
| | ) | |
| CLARENCE TROTTER, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's summary dismissal of defendant's postconviction petition is affirmed where his claim for ineffective assistance of counsel on direct appeal is frivolous and patently without merit.

¶ 2    Defendant Clarence Trotter appeals from the summary dismissal of his *pro se* petition brought pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)), arguing that his petition set forth an arguable claim that counsel on direct appeal was ineffective for not challenging the sufficiency of the evidence at trial. We affirm.

¶ 3    Defendant, while imprisoned for an unrelated conviction, was charged by indictment on February 14, 2007, with eight counts of murder, including two counts of first degree murder, arising from the September 20, 1981 death of Marilyn Dods. Defendant proceeded *pro se* at his jury trial after discharging the public defender. Trial commenced on October 22, 2012.

¶ 4    Richard Stevens testified that he moved to Chicago in the summer of 1981 to be with Dods, his girlfriend at the time. On September 19, 1981, Stevens spent the evening at Dods's apartment. He left the morning of September 20, 1981, at around 8 or 9 a.m. and returned to his apartment, where Dods was to join him after she attended church. Dods did not arrive when expected, and Stevens could not reach her by telephone. Later that day, Stevens went to Dods's apartment and found it "ransacked." Dods was in the bathtub with a television on her face, which Stevens moved. He determined that she was dead. Stevens also saw a knife in the area. He did not recall if he moved the knife, but may have told police officers that the knife was on Dods's bed. He called the police and had a "loud conversation" with them upon their arrival because he was upset.

¶ 5    On cross-examination, Stevens stated he was not sure if he told officers he left Dods's apartment that morning to attend a different church service. He organized his apartment until he returned to Dods's apartment. Stevens did not recall telling officers that he retrieved a butcher knife from the kitchen upon returning to Dods's apartment.

¶ 6    David Brennan testified that in September 1981 he lived next door to Dods in their building and saw her and Stevens regularly. On September 20, 1981, at around 10 a.m., Brennan left his apartment and saw Dods wave goodbye to Stevens, who was leaving her apartment. Brennan returned home sometime after noon. He did laundry that afternoon, which required him to pass Dods's door on his way to the basement. Dods's phone rang unanswered throughout the afternoon.

At some point, Brennan heard "somebody on the phone saying that something had happened" from inside Dods's apartment. He knocked on the door, and Stevens answered and said Dods had been murdered.

¶ 7     On cross-examination, Brennan testified that he first noticed Dods's phone ringing around 1 p.m. He made three or four trips to the basement while doing laundry, and heard the phone ringing each time. When Brennan entered Dods's apartment after Stevens let him in, Brennan took the phone from Stevens and explained the situation to the 911 operator.

¶ 8     Chicago police officer Thomas Keane testified that on September 20, 1981, he and his partner went to Dods's apartment, which was in "disarray." In the bathroom, Keane observed a knife on the floor and Dods in the bathtub. She had a small television on her abdomen, a ligature around her neck, and what appeared to be a gag around her chin.

¶ 9     After removing Dods's body from the tub, Keane observed that she was wearing a robe, a white slip, and a bra. The bra was torn and the slip was pulled up around Dods's waist. Dods's body was "partially in rigor," and her hands were bound behind her back at the wrist.

¶ 10    Keane identified People's Exhibit Nos. 3 through 15 as photographs of Dods's apartment as it appeared when he arrived. People's Exhibit No. 7 depicted the knife on the floor of the bathroom.

¶ 11    On cross-examination, Keane testified that Stevens admitted bringing the knife to the bathroom because he thought someone may still be inside. Stevens also told the officers that he went to church that day, then went to Dods's house to get a hammer. Keane did not document whether there was a hammer in Dods's apartment.

¶ 12    Dr. Lauren Moser Woertz, an assistant medical examiner for Cook County, testified that she reviewed Dods's autopsy report, prepared by Dr. Robert Stein, who was deceased at the time of trial. According to Woertz, Dr. Stein described injuries to Dods's body, including congestion and petechial hemorrhages around her eyes, cyanosis on her face, forehead, ears, neck, and shoulders, frothy discharge from her nose and mouth, bruising and reddening on her right cheek, and scrapes or bruises on her chest, left thigh, and right elbow. Dods also had a laceration of her labia minora. Dr. Stein's internal examination revealed bleeding in the neck and lungs. Dods's lungs were filled with water and blood. The frothy fluid discharge from Dods's mouth was consistent with death by drowning, as were the petechial hemorrhages in her eyes. The injury to her labia minora was consistent with forcible sexual intercourse. Woertz opined that Dods died by homicide from asphyxia due to drowning.

¶ 13    On cross-examination, Woertz stated that Dods's body exhibited evidence of blunt trauma, but she could not explain how the trauma occurred. Rigor mortis can happen within 30 minutes of death. The bruising on Dods's arms and legs was more likely caused by a struggle than drowning. The injury to Dods's labia minora "looked like a recent wound" and was "very uncommon" to result from consensual sexual intercourse.

¶ 14    Timothy McKeough testified that in September 1981 he worked as an evidence technician for the Chicago Police Department. On September 20, 1981, he collected evidence from Dods's apartment, including the knife from the bathroom and a pair of men's boxer shorts from the living room floor. The boxer shorts were "soaking wet." He also searched for fingerprints and found a "ridge impression" on a "small silver box." McKeough identified People's Group Exhibit No. 16

as a package containing the knife and boxer shorts recovered from the scene. On cross-examination, McKeough stated that he did not recover fingerprints from the television or knife.

¶ 15    Marian Caporusso testified that she worked as a forensic scientist in the Chicago Police Crime Laboratory in 1981. She examined vaginal swabs and boxer shorts in connection with Dods's case. The vaginal swab testing indicated the presence of semen. She did not perform a semen examination on the boxer shorts. The swabs and boxer shorts were preserved for future testing.

¶ 16    Brian Hapack, a forensic scientist for the Illinois State Police, testified that he tested 22 areas of the boxer shorts in 1999. One area indicated the presence of semen. Hapack made four slides from a sample of that area, 4-A through 4-D, from which he observed sperm cells. The samples were preserved for future testing. On cross-examination, Hapack could not say whether two "types" of semen were present on the sample.

¶ 17    Tracy Gallagher Reppen testified that she worked as a forensic biologist for the Illinois State Police from 1995 to 2003. In 1999, Reppen examined evidence from Dods's homicide using a DNA testing technique called RFLP, which was older than the methodology in use at the time of trial, STR. RFLP required a larger sample than STR. Reppen tested a vaginal swab taken from Dods, but could not identify the pattern required for RFLP testing. She also tested four samples from boxer shorts in connection with Dods's case, slides 4-A through 4-D, but could not identify the required patterns. Finally, Reppen received a dried blood standard from Dods and a saliva standard from Stevens. She extracted DNA from these standards, which, along with the swab and boxer shorts samples, was preserved for future analysis.

¶ 18    Mary Margaret Greer-Ritzheimer, a forensic scientist for the Illinois State Police, testified that in 2000 she conducted "STR, PCR DNA analysis" on standards from Dods and Stevens and extracted DNA from the boxer shorts and the vaginal swab. She identified two DNA profiles from the vaginal swab, one male and one female. The female profile matched the profile from Dods's standard. The male profile did not match the profile from Stevens's standard. Greer-Ritzheimer uploaded the male DNA profile into a database.

¶ 19    The DNA profile retrieved from slide 4-A-1 was a full profile that did not match Stevens but was consistent with the male DNA profile from the vaginal swab.[1] Slides 4-B-1 and 4-C-1 did not contain a full DNA profile, but Greer-Ritzheimer determined that the DNA from both did not match Stevens's standard and was consistent with the male profile from the vaginal swab and slide 4-A-1. Slide 4-D-1 contained a mixture of two DNA profiles, neither of which matched Stevens, but one of which was consistent with the male profile from the vaginal swab and the other slides. Greer-Ritzheimer could not identify the donor of the additional DNA profile identified in slide 4-D-1.

¶ 20    Ryan Paulsen, a forensic scientist with the Illinois State Police, testified that he conducted DNA analysis in Dods's case in 2005 and made an association between "an unknown profile developed on the vaginal swab to [defendant]." Paulsen requested a confirmatory buccal swab, which was retrieved from defendant. Paulsen compared the DNA standard from the buccal swab to the DNA extracted from the vaginal swab and from the semen stains on the boxer shorts. He concluded that the male DNA profile identified on the vaginal swab "matches the DNA profile of

---

[1] Greer-Ritzheimer and another witness, Ryan Paulsen, referred to the slides as 4-A-1 through 4-D-1, while Hapack and Reppen used 4-A through 4-D. The parties do not dispute that the witnesses referred to the same slides.

[defendant]." The profile would be expected to occur in one in 12 quadrillion black, one in 2.2 quintillion white, or one in 360 quadrillion Hispanic unrelated men.

¶ 21    The DNA profile from slide 4-A-1 also matched defendant and would be expected to occur at the same rate as the match from the vaginal swab. The profile from slide 4-B-1 could not be excluded from defendant. One in 4.1 million black, one in 230 million white, or one in 7.2 million Hispanic unrelated men could also not be excluded. Defendant also could not be excluded from the profile present on slide 4-C-1, with one in 1 trillion black, one in 780 trillion white, or one in 160 trillion Hispanic unrelated men also not excluded. He also could not be excluded from slide 4-D-1, with one in 1.3 quadrillion black, one in 350 quadrillion white, or one in 49 quadrillion Hispanic unrelated men also not excluded. The male DNA profiles from the vaginal swab and boxer shorts were consistent with each other.

¶ 22    On cross-examination, Paulsen testified that one of the samples had an additional partial DNA profile, from which the sex of the donor could not be determined. Though he could not compare full profiles for slides 4-B-1, 4-C-1, or 4-D-1, the retrievable information "was consistent with the DNA profile" of defendant. On redirect, Paulsen stated that neither Stevens's nor defendant's DNA profiles were consistent with the second profile identified from slide 4-D-1.

¶ 23    The State rested and defendant moved for a directed verdict, which the court denied.

¶ 24    John Onstwedder, a latent fingerprint examiner for the Illinois State Police, testified that he tested four latent fingerprints in connection with Dods's case, and his final report excluded defendant as a match for the fingerprints. On cross-examination, Onstwedder confirmed that it was possible for someone to handle an object and not leave "latent impressions *** suitable for comparison."

¶ 25    After closing arguments, the jury found defendant guilty of murder. The court reappointed the public defender to represent defendant posttrial.

¶ 26    At a hearing on March 19, 2013, defendant complained that his pretrial attorneys failed to ensure his speedy trial rights or to provide him with evidence he needed for trial, and that his posttrial attorney did not obtain the "trial file." The court held a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), and denied the claims. The court then sentenced defendant to natural life in prison and denied his motion to reconsider sentence.

¶ 27    On direct appeal, defendant claimed that he did not validly waive his right to counsel and that the State committed prosecutorial misconduct. We affirmed. *People v. Trotter*, 2015 IL App (1st) 131096.

¶ 28    On July 26, 2016, defendant filed a *pro se* postconviction petition, alleging (1) the trial court denied his right to counsel by discharging his pretrial counsel against his wishes, and (2) ineffective assistance on direct appeal for counsel's failure to argue that defendant should have been permitted to "choose the new law or old law to be sentenced under," spoliation of evidence, use of improper evidence, and sufficiency of the evidence. Regarding the sufficiency of the evidence claim, defendant argued "no evidence" showed he injured Dods or was present when someone else injured her.

¶ 29    On August 3, 2016, the circuit court summarily dismissed defendant's petition. At a hearing, the court stated the petition was "completely without merit."

¶ 30    On January 5, 2017, this court permitted defendant's late notice of appeal.

¶ 31    On appeal, defendant argues that the circuit court's summary dismissal was erroneous because the petition set forth an arguable claim for ineffective assistance of counsel on direct appeal for not challenging the sufficiency of the evidence.

¶ 32    The Act provides a method for a criminal defendant to challenge his conviction on the basis that it violates his state or federal constitutional rights. *People v. Buffer*, 2019 IL 122327, ¶ 12. Claims pursuant to the Act are reviewed in three stages. *People v. Johnson*, 2018 IL 122227, ¶ 14. Here, the circuit court summarily dismissed defendant's postconviction petition at the first stage.

¶ 33    At the first stage, the defendant need only establish the "gist" of a constitutional claim. *People v. Bailey*, 2017 IL 121450, ¶ 18. A postconviction petition is subject to summary dismissal at the first stage of review only where all of a defendant's claims are frivolous or patently without merit. *Johnson*, 2018 IL 122227, ¶ 14. A claim is frivolous or patently without merit where it has no arguable basis in law or fact. *People v. Boykins*, 2017 IL 121365, ¶ 9. On postconviction review, issues "which could have been raised on direct appeal are deemed waived." *People v. Lucas*, 203 Ill. 2d 410, 418 (2002). We review the summary dismissal of a postconviction petition *de novo*. *Boykins*, 2017 IL 121365, ¶ 9.

¶ 34    Defendant here did not argue the sufficiency of the evidence on direct appeal, and the claim is thereby waived. We may reach the issue, however, because defendant contends that the waiver resulted from ineffective assistance of counsel. See *People v. Simms*, 192 Ill 2d. 348, 362 (2000).

¶ 35    A criminal defendant is entitled to effective assistance of counsel on direct appeal. *People v. Easley*, 192 Ill. 2d 307, 328-29 (2000). To establish ineffective assistance of counsel, the defendant must establish deficient conduct and prejudice therefrom. *People v. Hodges*, 234 Ill. 2d

1, 17 (2009). At the first stage of postconviction review, the defendant need only demonstrate arguably deficient conduct and arguable prejudice. *Id.*

¶ 36    "Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *Simms*, 192 Ill. 2d at 362. Accordingly, we must consider the merits of the underlying claim to determine if the defendant can demonstrate prejudice. *Id.*

¶ 37    Defendant's underlying claim here is that the evidence was insufficient to sustain his conviction. When reviewing the sufficiency of the evidence, the reviewing court must determine if a rational factfinder, construing all the evidence in the light most favorable to the State, could have found the defendant guilty beyond a reasonable doubt. *People v. Hardman*, 2017 IL 121453, ¶ 37. The reviewing court will not "substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). All reasonable inferences are drawn in favor of the State. *People v. Harris*, 2018 IL 121932, ¶ 26. Moreover, at trial, the factfinder is not required to "disregard inferences which flow normally" from the evidence or raise any proffered defense theory to the level of reasonable doubt. *Jackson*, 232 Ill. 2d at 281.

¶ 38    Here, to prove defendant guilty of first degree murder, the State was required to show, in relevant part, that defendant killed an individual without lawful justification, and in doing so, either intended to kill or to cause great bodily harm, or knew that his acts would cause death. 720 ILCS 5/9-1(a)(1) (West 2006).

¶ 39    The evidence at trial showed that Dods and Stevens departed company between 8 and 10 a.m. on September 20, 1981. When Dods did not come to Stevens's apartment that afternoon, Stevens called Dods, who did not answer. He went to Dods's apartment and found her drowned in the bathtub. Her neighbor, Brennan, testified that he saw Stevens leave Dods's apartment that morning and repeatedly heard the phone ringing in the apartment that afternoon. Brennan eventually knocked on the door and found Stevens on the phone calling 911. Stevens told Brennan that Dods had been killed.

¶ 40    Chicago police officers found Dods in the bathtub with her hands bound behind her back and what appeared to be a gag around her chin. The autopsy revealed signs of a struggle and evidence of homicide by drowning. She had a tear to her labia minora that was "very uncommon" to find as the result of consensual sexual intercourse. A vaginal swab was taken from Dods and a pair of wet boxer shorts were recovered from the scene.

¶ 41    The vaginal swab and samples from the boxer shorts were subjected to multiple rounds of testing across three decades. Caporusso testified that the vaginal swab indicated the presence of semen from a test from 1981. Hapack testified that the boxer shorts indicated the presence of semen based on observations he made in 1999. Greer-Ritzheimer testified that she tested the vaginal swab, boxer shorts, and standards from Dods and Stevens in 2000. She identified a male profile from the vaginal swab that did not match Stevens but did match the profile present on the samples from the boxer shorts. The male profile could not be identified at the time, but Greer-Ritzheimer uploaded it into a database. Finally, Paulsen testified that in September 2005, he made an association between the male profile found on the vaginal swab and the boxer shorts and defendant's DNA profile, which Paulsen verified by testing a buccal swab taken from defendant.

Defendant's DNA profile matched the male profile from the vaginal swab and one of the boxer shorts samples, and could not be excluded from the other three samples.

¶ 42    Based on this evidence, we find that a rational factfinder could have found defendant guilty of first degree murder beyond a reasonable doubt. Defendant claims the DNA evidence only proves he had sexual intercourse with Dods, and the other evidence connecting him to the crime is only circumstantial. It is well-established, however, that circumstantial evidence may sustain a conviction. See *People v. Pollock*, 202 Ill. 2d 189, 217 (2002). The circumstantial evidence here allowed an inference that Dods was murdered after Stevens left the apartment but before he returned, a matter of hours. Dods's body displayed signs of a physical struggle and nonconsensual sexual intercourse, and her autopsy showed her death was a homicide by asphyxia due to drowning. Semen retrieved from Dods's vagina and from a pair of wet boxer shorts found in the apartment matched defendant's DNA profile. An inference that naturally flows from this evidence is that after Stevens left, defendant entered Dods's apartment, sexually assaulted her, and drowned her in the bathtub.

¶ 43    Defendant argues that the evidence here is similar to the evidence we found insufficient in *People v. Escort*, 2017 IL App (1st) 151247. In *Escort*, this court ruled that DNA evidence suggesting the defendant had sexual intercourse with a murder victim within 72 hours of her death was insufficient on its own to prove "that the defendant and the victim had sexual relations shortly before her death or that he was the last person to see the victim alive." *Id.* ¶¶ 20-21. Here, however, there is other circumstantial evidence linking defendant to Dods's death, including that Dods died by drowning, and wet boxer shorts with defendant's semen were found at the scene. Defendant also emphasizes that he was not a match for the fingerprints recovered from the scene. But it is the

factfinder's role to judge the weight of the evidence, and a rational factfinder could have found, as the jury did here, that the DNA and other evidence outweighed the fingerprint evidence. *Jackson*, 232 Ill. 2d at 280-81 (2009).

¶ 44    Because we find defendant's underlying sufficiency of the evidence claim lacks merit, it follows that he cannot establish prejudice from counsel's failure to raise it on direct appeal. *Simms*, 192 Ill. 2d at 362. Defendant's claim of ineffective assistance, therefore, fails. Accordingly, the circuit court's summary dismissal of defendant's postconviction petition is affirmed.

¶ 45    Affirmed.