# Illinois Official Reports

## Appellate Court

---

### *People v. Singer*, 2021 IL App (2d) 200314

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAXTON DALE SINGER, Defendant-Appellant. |
| District & No. | Second District No. 2-20-0314 |
| Filed Rehearing denied | September 2, 2021 September 29, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 18-CM-2743; the Hon. Michael Noland, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Terry A. Ekl and Tracy L. Stanker, of Ekl, Williams & Provenzale, LLC, of Lisle, for appellant. Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Lynn M. Harrington, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Justices Jorgensen and Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a bench trial, defendant, Paxton Dale Singer, was convicted of the offense of disorderly conduct (720 ILCS 5/26-1(a)(1) (West 2016)). In ruling on defendant's posttrial motion, the trial court found that the evidence against defendant was insufficient. The court nevertheless granted a new trial, giving the State leave to amend its complaint. Defendant filed a motion to dismiss the charge on double-jeopardy grounds, which the court denied. The court rescinded its order granting a new trial and sentenced defendant to 12 months' court supervision. Defendant appeals. We reverse his conviction because defendant was twice put in jeopardy for the same offense.

¶ 2                                           I. BACKGROUND

¶ 3        On October 17, 2018, the Kane County state's attorney charged defendant by complaint with sexual exploitation of a child (count I) (720 ILCS 5/11-9.1(a-5) (West 2016)) and disorderly conduct (count II). These charges arose from text messages containing sexual innuendo that defendant, the youth pastor at Harvest Bible Church in Aurora, sent to the minor victim, J.S. At a bench trial commencing on September 4, 2019, the court acquitted defendant of sexual exploitation of a child but convicted him of disorderly conduct.

¶ 4        Count II (disorderly conduct) alleged that defendant "knowingly texted J.S., age 16, and asked him how often he jerks off and asked J.S. to spend a weekend with [defendant] in such an unreasonable manner as to alarm and disturb parents [names manually crossed out] and provoke a breach of the peace." On July 2, 2019, the State amended count II to allege that the offense occurred between "on or about December 1, 2017, through December 31, 2017."

¶ 5              A. The State's Motion *in Limine* to Admit Other-Crimes Evidence

¶ 6        On June 26, 2019, the State moved to admit evidence of "other sex acts" pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011). Pertinent to this appeal, the court found that certain text messages of a sexual nature that defendant sent to 17-year-old T.N. were admissible "as a common design" to prove only the disorderly conduct charge.

¶ 7                               B. The State's Evidence at Trial

¶ 8        Defendant's bench trial commenced on September 4, 2019. After the State introduced into evidence a series of text messages between defendant and T.N., and another series of text messages between defendant and J.S., the State called the following witnesses.

¶ 9                                         1. *Kurt Gebhards*

¶ 10       Kurt Gebhards testified to the following. From April 2016 through July 2018, he was the pastor at the Rolling Meadows campus of the church. In 2017, the Aurora church employed defendant as a youth director at its campus. One of defendant's roles was to mentor small groups of students. The church had established guidelines governing appropriate interactions between defendant and the students. Overnights with students were not within those guidelines.

¶ 11       By January 2018, Gebhards had learned that defendant sent inappropriate texts to T.N. On January 7, 2018, Gebhards, along with three other church leaders, met with defendant. At that meeting, defendant acknowledged the wrongfulness of his conduct and agreed that he should

be terminated from his position. Defendant signed a letter of resignation.

¶ 12                                  2. *Landon MacDonald*

¶ 13     Landon MacDonald testified to the following. As defendant's immediate boss, MacDonald was one of the church leaders present at the January 7, 2018, meeting when defendant resigned his employment. Without disclosing the content of the texts between defendant and T.N., MacDonald termed it "inappropriate subject matter to be talking about with a teenager." On cross-examination, MacDonald acknowledged that defendant later denied the truth of the document that he signed when resigning his employment.

¶ 14                                      3. *C.N.*

¶ 15     C.N. is T.N.'s father. He testified to the following. When T.N. was 16 years old, he met defendant at a church retreat. In the fall of 2017, defendant became T.N.'s spiritual mentor. In December 2017, C.N. began monitoring text messages between defendant and T.N. C.N.'s concerns about those texts caused him to disclose the texts to the church's executive pastor the following January.[1] C.N. was "extremely disturbed, fearful for my son" and "fearful" that defendant had betrayed a position of trust "for his own sexual desire." According to C.N., the church reported the matter to civil authorities, with whom both he and T.N. cooperated. On cross-examination, C.N. admitted that he allowed T.N. to continue texting with defendant even after he saw the initial messages. C.N. testified that he was "letting [defendant] hang himself." C.N. testified that those texts alarmed and disturbed him so much that he did not sleep for a week.

¶ 16                                      4. *J.S.*

¶ 17     J.S. testified that he was born on October 27, 2001. He was 17 years old at the time of trial and was a high school senior. In the summer between eighth grade and high school, J.S. met defendant at a church camp in Michigan. Defendant was J.S.'s cabin leader and then he became J.S.'s spiritual advisor. They maintained a texting relationship from summer 2017 through December 2018, although they also met in person several times.[2]

¶ 18     J.S. read some of their text messages into the record, as follows. In February 2017, defendant asked J.S. what kind of underwear he preferred and asked for a picture. J.S. photographed a pair of his underwear lying on the floor. Defendant replied that he wanted to see J.S. in the underwear. J.S. said that his underwear was "tight," and defendant responded, "So?" Then J.S. told defendant that his mother asked J.S. why defendant wanted such a photograph. Defendant texted: "I just realized how weird that sounds. My bad." In August 2017, defendant again brought up the subject of underwear and suggested that J.S. model his boxers to defendant on FaceTime. In December 2017, defendant had asked J.S. to stay overnight at his house, but J.S.'s parents did not allow it. Defendant also asked J.S. whether he

---

[1]C.N. read many of the text messages, which are highly sexual in nature, into the record. Because the trial court did not rely on this evidence in finding defendant guilty, and because these texts are not germane to this appeal, we do not detail their contents.

[2]J.S.'s memory of dates was faulty, as the written text messages between defendant and J.S. in evidence reflect that they occurred as early as October 2016. Defendant was terminated from employment in January 2018.

watched pornography. When J.S. stated that he had little interest in doing so, defendant counseled that that was good and that viewing such material sent one to a "dark place." J.S. testified that he ceased texting with defendant in December 2018.

On cross-examination, J.S. testified that he was always truthful with defendant. J.S. testified that his mother found out that defendant wanted a photo of J.S. in his underwear when J.S. laughed aloud at the text. J.S. texted in July 2017 that his parents would allow him to stay overnight with defendant. On August 7, 2017, J.S. again texted defendant that his parents would allow an overnight stay. However, in December 2017, J.S. told defendant that he could not stay over because of a family get-together. According to J.S., his parents were never "upset" in December 2017 over his text messages with defendant.

### 5. *D.S.*

D.S., J.S.'s father, testified to the following. D.S. approved of the friendship between defendant and J.S. because their families were involved in the church and defendant was in a leadership position. D.S. knew what defendant's professional responsibilities required, and overnights with the students were not allowed. D.S. testified that in November 2017 defendant wanted J.S. to stay over with him.

When the prosecutor asked D.S. whether he was aware of any "inappropriate" texts between defendant and J.S., D.S. answered, "I certainly questioned them. I didn't understand them, was kind of confused by them." D.S. reiterated: "I was confused, is the word I would use, by those texts." According to D.S., "[Defendant and our family] had a trusting relationship that I felt that we built up over the time, and I didn't understand it, the nature of it."

D.S. testified that he told his wife, M., in December 2017 that he was going to call defendant and tell him that a sleepover with J.S. "isn't going to happen." D.S. explained to defendant in that call that such an arrangement "looks inappropriate." D.S. quoted scripture to defendant regarding "not a hint of sexual immorality," but, according to D.S., "I wasn't going to win my brother over to my thinking," so he ended the conversation. D.S. testified that he took no further action, "not with [defendant] and not with anybody else at that time." Although, according to D.S., he prohibited J.S. from further communication with defendant.

After D.S. learned that the church had fired defendant, he met with Craig Steiner, the pastor of the Aurora campus, on January 31, 2018. D.S. disclosed the text messages to Steiner. D.S. described those messages as being "totally inappropriate." When the prosecutor asked D.S. if those texts were "disturbing" to him, D.S. said, "Oh, I felt uncomfortable—" D.S. said again, "I felt uncomfortable." He explained, "It seemed out of character that [defendant] would be sending those texts to my son like that. So I felt very uncomfortable about it." The prosecutor asked D.S. if he talked to his wife about it. D.S. answered, "We talked about it off and on, yes." D.S. testified that defendant's request for a sleepover was the "last straw" and "that's when me and my wife talked about I think we're going to pull this back."

D.S. testified that he called defendant because he thought that they had a "good trusting relationship" and "it was so out of character. And that's why it was disturbing to me, the repeated questions, and the—what about a picture, and the masturbation. So it was encapsulating all of it."

After D.S.'s testimony, the State rested. The court denied defendant's written motion for a directed finding, and defendant elected not to testify or present witnesses on his behalf. In a

written ruling on November 12, 2019, the court found defendant not guilty of count I, sexual exploitation of a child, but guilty of count II, disorderly conduct.

¶ 27                                  C. Defendant's Posttrial Motion

¶ 28       On November 19, 2019, defendant filed a "motion for a new trial or a finding of not guilty." Defendant argued only that the State failed to prove the allegations in the complaint. Specifically, defendant argued that the record was "void of any evidence" that defendant sent J.S. the texts referenced in the complaint during December 2017. Defendant also argued that there was no evidence that defendant's texts alarmed and disturbed J.S.'s parents or provoked a breach of the peace.

¶ 29       On November 22, 2019, the court entered a written order, in pertinent part, as follows: "Court hears motion for new trial/judgment withstanding [*sic*] the verdict. Court grants the motion for new trial. Court grants the State leave to file an amended complaint." This order followed a hearing on defendant's posttrial motion.

¶ 30       In its oral ruling at that hearing, the court stated: "[A]s much as I would like to bring closure to this matter here today, I take the defendant's observations to heart." The court then stated: "I am recognizing that there seem [*sic*] to be a culmination of events leading to a level of alarm and disturbance." The court then stated:

> "Whether or not that disturbance occurred during the month of December 2017, as much as I wish I could conclude whether they were or they were not [*sic*], at this point I feel as though I cannot. *** I'm going to grant the motion for a new trial, but I am also going to grant leave to the State to amend its pleadings. If we're going to have a new trial, we're going to have it on solely the count II [*sic*], disorderly conduct; and we're going to hear testimony with regard to the alarming and disturbing nature of the exchanges between J.S. and the defendant and the effect that those had on the parents and on, perhaps, the larger community, and what is reasonable to expect that those exchanges may have."

¶ 31       When defense counsel pointed out that the basis for the posttrial motion was lack of proof beyond a reasonable doubt, which would preclude the State from retrying defendant, the court stated:

> "The basis for a new trial is to fix perhaps a legal error that had occurred; that is, that perhaps there was some evidence that had been admitted or not admitted in error or perhaps there was discovery of some new evidence. These are factual matters and legal matters as well. So you're suggesting that I have not met—or, excuse me, the State has not met its burden beyond a reasonable doubt. So, I have heard your argument, and I am not—like I say, I am not convinced; I am not prepared to enter a different finding than I had previously at this point absent further argument and evidence."

¶ 32       The State then inquired whether the court was granting a new trial with leave to amend the complaint because the complaint was deficient. The court replied:

> "I am not making a finding with respect to the complaint itself on its face. You have offered some argument, some indication, regarding *** case law and pattern *** instructions that indicate that the timeline in question, okay, may be broader and that, as a matter of law, that timeline is still an open issue or it could be a matter of interpretation by this court. So, with that in mind, if there is an amendment to the

pleadings that the State would wish to submit or file as a reflection of the pattern instruction, I believe that would be proper."

¶ 33                    D. Defendant's Motion to Dismiss on Double-Jeopardy Grounds

¶ 34    On January 3, 2020, defendant moved to dismiss the disorderly conduct charge, arguing that retrial would violate double jeopardy. Defendant argued that, as the court did not grant a new trial based on any procedural or evidentiary errors, the insufficiency of the evidence was the only ground for a new trial.

¶ 35    On February 11, 2020, the court entered a minute order denying the motion to dismiss. Then, on February 20, 2020, the court issued a written ruling. The court made two findings: (1) no evidentiary or procedural error occurred "during the pendency of this matter" and (2) "sufficient evidence is presented for the State to proceed forward with its case." The court (1) denied defendant's motion to dismiss, (2) let "stand" its "prior" finding of guilt of disorderly conduct, and (3) rescinded the order granting a new trial.

¶ 36                    E. Defendant's Motion to Vacate the February 11, 2020, Order

¶ 37    On February 20, 2020, defendant moved to vacate the order denying his motion to dismiss. Defendant alleged that at the hearing on the motion to dismiss[3] the court, rather than rule on the motion, vacated its order granting a new trial and reinstated defendant's guilty verdict.

¶ 38    On May 4, 2020, the court issued a lengthy written ruling denying the motion to vacate. The court found that no evidentiary or procedural errors had occurred in the case. The court also found that it had denied defendant's posttrial motion insofar as defendant requested a finding of not guilty. The court further found that defendant's motion to dismiss for violation of double jeopardy became moot when it rescinded its order granting a new trial. Thus, the court reasoned, it never subjected defendant to double jeopardy. The court further opined that, in ruling on the posttrial motion and granting a new trial, it never vacated defendant's conviction of disorderly conduct. The court proceeded to sentence defendant to 12 months' court supervision. Defendant timely appealed.

¶ 39                                   II. ANALYSIS

¶ 40    Defendant raises three issues: (1) whether he was proved guilty of disorderly conduct beyond a reasonable doubt, (2) whether the court erred in granting a new trial after finding that the evidence against defendant was insufficient to prove him guilty beyond a reasonable doubt, and (3) whether the court erred in denying defendant's motion to dismiss for violation of double jeopardy.

¶ 41    Preliminarily, we note that the State filed a motion to clarify the record, which was taken with the case. At the hearing on defendant's posttrial motion, the prosecutor misspoke and indicated that a specific text message sent to J.S. by defendant was part of People's Exhibit 22 when, in fact, it was part of People's Exhibit 20. In its brief, the State inadvertently made the same error. Defendant has no objection to clarifying the record in this regard, and we grant that motion.

---

[3]There is no report of proceedings in the record for the hearing on the motion to dismiss.

¶ 42                    A. Whether Defendant Was Proved Guilty Beyond a Reasonable Doubt

¶ 43        Heeding our supreme court's admonishment to avoid reaching constitutional issues if a case can be decided on nonconstitutional grounds (see *People v. Hampton*, 225 Ill. 2d 238, 244 (2007)), we first address defendant's contention that he was not proved guilty beyond a reasonable doubt.

¶ 44        To prove defendant guilty of the offense of disorderly conduct, the State must prove that defendant (1) knowingly did any act (2) in such an unreasonable manner (3) as to alarm or disturb another and (4) to provoke a breach of the peace. *People v. Pence*, 2018 IL App (2d) 151102, ¶ 15. Here, the State initially charged that defendant "knowingly texted J.S., age 16, and asked him about how often he jerks off and asked J.S. to spend a weekend with [defendant] in such an unreasonable manner as to alarm and disturb parents [names manually crossed out] and provoke a breach of the peace." The State later amended the charge to allege that the offense occurred between "on or about December 1, 2017, through December 31, 2017." Defendant contends that the evidence failed to prove that defendant sent texts about "jerking off" and sleeping over during December 2017, that J.S.'s parents were alarmed and disturbed, or that defendant's texts provoked a breach of the peace.

¶ 45        A reviewing court will not reverse a criminal conviction unless the evidence is so " 'improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of [the] defendant's guilt.' " *People v. Escort*, 2017 IL App (1st) 151247, ¶ 17 (quoting *People v. Collins*, 214 Ill. 2d 206, 217 (2005)). When the defendant challenges the sufficiency of the evidence supporting his conviction, we must determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

¶ 46        Concerning whether the State failed to prove that the offense occurred during December 2017, the record shows that defendant sent J.S. texts concerning "jerking off" and having an overnight, albeit on dates other than during December 2017.[4] The State argues—and we agree—that the prosecution need not prove the precise date alleged in an indictment if the date is not an essential element of the crime and the statute of limitations is not involved. See *People v. Rivas*, 5 Ill. 2d 556, 561-62 (1955). Here, the statute of limitations was not involved, nor did defendant interpose an alibi defense. Further, the amended complaint alleged that the date of the offense was "on or about" the month of December 2017, making any variance nonfatal. See *People v. Alexander*, 99 Ill. App. 3d 810, 812 (1981) (where State alleged that the defendant exerted unauthorized control of certain property "on or about" October 31, 1979, but proved that the date was November 11, 1979, the variance was not fatal).

¶ 47        Next, defendant argues that the State failed to prove that J.S.'s parents were alarmed and disturbed by the text messages. Although the amended complaint alleged that both of J.S.'s parents were alarmed and disturbed, J.S.'s mother did not testify. D.S. testified that he and M. talked about the texts and D.S. told her that he planned to talk to defendant about them. J.S. testified that his mother wanted to know why defendant was asking for a picture of J.S.'s underwear, obliquely showing some concern on M.'s part. However, we agree with defendant that evidence that M. was alarmed and disturbed is lacking.

---

[4]At the hearing on the posttrial motion, the State produced one text from December 2017 referencing a sleepover. That text was part of People's Exhibit 20.

¶ 48    The State argues that the inclusion of M. in the complaint was surplusage. Where an indictment alleges the essential elements of an offense, other matters unnecessarily added can be disregarded as surplusage. *People v. Figgers*, 23 Ill. 2d 516, 519 (1962). The disorderly conduct statute requires only that the State prove that the defendant's conduct alarmed and disturbed "another." 720 ILCS 5/26-1(a)(1) (West 2016). Thus, in *People v. Davis*, 82 Ill. 2d 534, 539 (1980), where the State proved that the defendant threatened a person other than the one named in the complaint, our supreme court held that proof that the defendant threatened the wrong person was not fatal because the defendant made a "general threat." The court opined that the phrase in the complaint concerning the name of the person threatened "could be disregarded as surplusage." *Davis*, 82 Ill. 2d at 539. Consequently, we agree with the State that the inclusion of M. in the complaint was surplusage so long as the State proved that defendant's conduct alarmed and disturbed "another."

¶ 49    We now discuss the proof that D.S. was alarmed and disturbed. D.S. testified that he questioned the text messages and was confused by them. He also testified that he felt "uncomfortable." He testified that he found defendant's texts "disturbing." That he did not use the precise words "alarmed and disturbed" is not dispositive. In determining culpability, we must consider the surrounding circumstances. *Pence*, 2018 IL App (2d) 151102, ¶ 17. D.S. made clear that he was confused by the texts because defendant was in a position of trust, a youth pastor in D.S.'s religious community, for whom it would be "out of character" to violate that trust. Additionally, D.S. had a bond with defendant's family. Because of these considerations, D.S. confronted defendant about wanting an overnight with J.S. Defendant argues that all D.S. did was quote scripture to defendant. However, according to D.S., by quoting scripture, he hoped to correct defendant's moral error. When that did not work, D.S. prohibited J.S. from further contact with defendant. He disclosed the texts to church authorities after learning that defendant had been terminated for similar misconduct.

¶ 50    Defendant argues that D.S. was disturbed "unrelated to any text message communication." The record shows otherwise. D.S. testified that it was defendant's breach of what D.S. thought was a "good trusting relationship" and defendant's "repeated questions" about a picture and masturbation that disturbed him. He stated, "So it was encapsulating all of it." Defendant also maintains that D.S. was not concerned about overnights because J.S. had texted defendant that his parents would allow it. However, D.S.'s testimony was otherwise. D.S. testified that the church did not permit overnights between students and church counselors. He also testified that defendant's request for an overnight was the "last straw," which caused him to confront defendant and to terminate the relationship between defendant and J.S. Viewing the evidence in the light most favorable to the prosecution, as we must, we determine that it was sufficient to prove that defendant's conduct alarmed and disturbed another.

¶ 51    Defendant next argues that the State failed to prove that his conduct provoked a breach of the peace. Specifically, defendant maintains that he did not threaten, molest, or harass anyone and that his conduct did not menace public order or tranquility. For purposes of the disorderly conduct statute, a breach of the peace can occur without overt threats, and it need not occur in public. *Pence*, 2018 IL App (2d) 151102, ¶ 17 (citing *People v. McLennon*, 2011 IL App (2d) 091299, ¶ 31). Culpability is equally dependent upon the type of conduct and the surrounding circumstances. *In re B.C.*, 176 Ill. 2d 536, 552 (1997). In *People v. Albert*, 243 Ill. App. 3d 23, 27 (1993), the defendant was properly convicted of disorderly conduct when her screaming at 2 a.m. woke and disturbed one neighbor. In *People v. Ellis*, 141 Ill. App. 3d 632, 633-34 (1986),

the defendant's conviction of disorderly conduct was upheld where, in an intoxicated condition, he tore down Christmas decorations outside a store while the two store owners, the only persons inside the store, watched and then called the police.

¶ 52 Here, defendant's texts to J.S. were inappropriately sexual and threatened J.S. because they were grooming in nature. Looking at the surrounding circumstances, defendant was J.S.'s spiritual mentor and was in a position of trust, not only to J.S. but also to his entire family. Those texts caused D.S. to confront defendant verbally and then to involve the larger church community. Accordingly, we hold that defendant was proved guilty of disorderly conduct beyond a reasonable doubt. Having affirmed defendant's conviction, we must now address his double-jeopardy contention.

¶ 53 B. Whether the Trial Court Erred in Denying Defendant's Motion to Dismiss

¶ 54 The State contends that defendant forfeited this issue by failing to include in the record a transcript of the February 11, 2020, hearing at which the court ruled on the motion to dismiss on double-jeopardy grounds. The defendant bears the responsibility of preserving a sufficiently complete record of proceedings before the trial court. *People v. Boston*, 2016 IL App (1st) 133497, ¶ 62. Where the record is incomplete, we presume that the trial court's judgment was proper. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). The State does not inform us how the absence of the transcript renders the record incomplete, as we have the court's minute order of February 11, 2020, and its written ruling of February 20, 2020. Consequently, we decline to deem this issue forfeited.

¶ 55 Generally, absent an abuse of discretion, we will not reverse a trial court's ruling on a motion to dismiss a charge on double-jeopardy grounds. *People v. Ventsias*, 2014 IL App (3d) 130275, ¶ 10.

¶ 56 1. *The Court's Ruling on Defendant's Posttrial Motion*

¶ 57 After the court granted defendant a new trial and gave the State leave to amend its complaint, defendant filed a motion to dismiss the charge based upon double-jeopardy grounds. Defendant construed the court's ruling on his posttrial motion as a finding that the State's evidence was insufficient to convict him of disorderly conduct. Defendant argues that the court vacated his conviction but allowed the State to retry him for the same offense. The State argues that the court did not find that the evidence was insufficient. According to the State, the court granted a new trial in error but remedied it when it rescinded the order granting a new trial.

¶ 58 Before we address defendant's argument that his right against double jeopardy was violated, we must determine whether the court found that the evidence was insufficient to convict defendant of disorderly conduct.

¶ 59 In its ruling, the court recognized that "there seem [*sic*] to be a culmination of events leading to a level of alarm and disturbance." The court then stated: "Whether or not that disturbance occurred during the month of December 2017, as much as I wish I could conclude whether they were or they were not [*sic*], *at this point I feel as though I cannot*." (Emphasis added.) The court then stated: "I'm going to grant the motion for a new trial, but I am also going to grant leave to the State to amend its pleadings." The court continued:

- 9 -

"If we're going to have a new trial, we're going to have it on solely the count II [*sic*], disorderly conduct; *and we're going to hear testimony with regard to the alarming and disturbing nature of the exchanges between J.S. and the defendant and the effect that those had on his parents and on, perhaps, even the larger community, and what is reasonable to expect that those exchanges may have.*" (Emphasis added.)

¶ 60    In our view, the court found that there was some evidence ("a level") that defendant's conduct had alarmed and disturbed another, but the evidence did not prove to the court's satisfaction that it occurred in December 2017, as charged, so the court gave the State leave to amend the complaint. Then, in no uncertain language, the court instructed the State that, on retrial, it wanted to hear additional evidence as to the alarming and disturbing nature of the text messages and their impact on the parents and the public. The court thus indicated that the State's evidence on those elements at the first trial was insufficient to reach the height of beyond a reasonable doubt.

¶ 61    After defense counsel pointed out that his posttrial motion was directed to the insufficiency of the evidence, which would preclude a new trial, the court stated: "So I have heard your argument, and I am not—like I say, I am not convinced. *I am not prepared to enter a different finding than I had previously at this point absent further argument and evidence.*" (Emphasis added.) In our view, the court is saying that it needed additional evidence as to the elements of the offense.

¶ 62    The court then returned to the issue of when the offense occurred. The prosecutor asked the court whether it was ruling that the complaint was insufficient. The court stated that, while the State had argued that it was not bound by the timeline pleaded in the complaint, the matter of the timeline "is still an open issue." In our view, this could mean only that whether the State had proved the date on which the offense occurred was still an "open issue" in the court's mind. In sum, we determine that the court granted a new trial to give the State a second opportunity to present evidence as to the date of the offense and the elements of alarm and disturb and breach of the peace. Common sense forces us to conclude that additional evidence would be unnecessary at the second trial if the court were convinced that the evidence at the first trial was sufficient beyond a reasonable doubt. Otherwise, we must conclude—absurdly—that the court, having found defendant guilty beyond a reasonable doubt, urged the State to convict him again, only with proof that would exceed beyond a reasonable doubt.

### ¶ 63    2. *Double-Jeopardy Principles*

¶ 64    The fifth amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. The double-jeopardy clause applies to the states through the due process clause of the fourteenth amendment (U.S. Const., amend. XIV). *Benton v. Maryland*, 395 U.S. 784, 787 (1969). The Illinois Constitution also prohibits placing persons in double jeopardy. Ill. Const. 1970, art. I, § 10. We construe the Illinois double-jeopardy clause in the same manner as the double-jeopardy clause of the fifth amendment to the United States Constitution. *People v. Staple*, 2016 IL App (4th) 160061, ¶ 13. The double-jeopardy clause protects against three distinct interests: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same crime. *Ventsias*, 2014 IL App (3d) 130275, ¶ 12.

- 10 -

¶ 65　　　　The double-jeopardy clause forbids a second trial to give the State another opportunity to supply evidence that it failed to present in the first trial. *People v. Olivera*, 164 Ill. 2d 382, 393 (1995). However, errors in the proceedings leading to the defendant's conviction do not prohibit retrial under the double-jeopardy clause. *Olivera*, 164 Ill. 2d at 393. Here, the trial court found in its written orders of February 20, 2020, and May 4, 2020, that "no evidentiary or procedural" errors occurred. Even so, the protection against double jeopardy applies only where some event terminated the original jeopardy. *Ventsias*, 2014 IL App (3d) 130275, ¶ 13.

¶ 66　　　　The first step in our analysis is to determine when jeopardy attached. See *Ventsias*, 2014 IL App (3d) 130275, ¶ 12 (reviewing court must first decide whether the defendant was placed in jeopardy in the first proceeding). In a bench trial, jeopardy attaches when the first witness is sworn and the court begins to hear evidence. *People v. Gaines*, 2020 IL 125165, ¶ 25. There is no question that jeopardy attached in the present case. The State argues that there was but one continuing jeopardy because the court did not vacate defendant's conviction when ordering a new trial. Then, the State argues, the court rescinded the erroneous order granting a new trial.

¶ 67　　　　The State relies on *People v. Mink*, 141 Ill. 2d 163 (1990). In *Mink*, a jury convicted the defendant of unlawful possession and unlawful delivery of a controlled substance. *Mink*, 141 Ill. 2d at 166. Defendant alleged in his posttrial motion that the State failed to introduce sufficient evidence of venue. *Mink*, 141 Ill. 2d at 166. The trial court granted the defendant a new trial. *Mink*, 141 Ill. 2d at 166. The State moved for reconsideration, which the court granted and reinstated the defendant's convictions. *Mink*, 141 Ill. 2d at 166. The appellate court reversed, holding that the grant of a new trial was in substance an acquittal, which precluded retrial. *Mink*, 141 Ill. 2d at 166. Our supreme court assumed, without deciding, that the grant of a new trial constituted an acquittal for purposes of appeal. *Mink*, 141 Ill. 2d at 170. The court held that the defendant was never actually subjected to a second trial where the court vacated its order granting a new trial and reinstated the guilty verdicts; therefore, the prohibition against double jeopardy was not violated. *Mink*, 141 Ill. 2d at 174-79.

¶ 68　　　　Twenty-three years after *Mink*, the United States Supreme Court decided *Evans v. Michigan*, 568 U.S. 313 (2013). In *Evans*, the trial court erroneously directed a verdict of acquittal in the defendant's arson trial, believing that the prosecution had failed to prove an element of the offense, which, in actuality, it did not have to prove. *Evans*, 568 U.S. at 315. The Michigan Supreme Court held that an erroneous acquittal did not invoke double jeopardy to bar retrial. *Evans*, 568 U.S. at 317. The United States Supreme Court disagreed and held that a "mistaken acquittal is an acquittal nonetheless." *Evans*, 568 U.S. at 318. The Supreme Court defined an "acquittal" to "encompass any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense." *Evans*, 568 U.S. at 318. The Supreme Court held that an "acquittal" includes (1) a ruling by the trial court that the evidence is insufficient to convict, (2) a factual finding that necessarily establishes the defendant's lack of culpability, and (3) any other ruling related to the ultimate question of guilt or innocence. *Evans*, 568 U.S. at 319. Because the law attaches particular significance to an acquittal, "a merits-related ruling concludes proceedings absolutely." *Evans*, 568 U.S. at 319. This means that jeopardy terminates with an acquittal. After *Evans*, it is clear that the acquittal—not whether the defendant is retried—triggers the prohibition against double jeopardy.

¶ 69　　　　Following *Evans*, this court decided *People v. Cervantes*, 2013 IL App (2d) 110191. In *Cervantes*, the trial court, in a bench trial, found the defendant not guilty of armed violence based on insufficient evidence. *Cervantes*, 2013 IL App (2d) 110191, ¶ 59. After the defendant

was no longer in jeopardy, the State pointed out to the judge that he had mistakenly entered the not-guilty verdict. *Cervantes*, 2013 IL App (2d) 110191, ¶ 59. The judge then vacated the not-guilty verdict and continued the matter for a ruling. *Cervantes*, 2013 IL App (2d) 110191, ¶ 59. The judge made further findings of fact and entered a conviction. *Cervantes*, 2013 IL App (2d) 110191, ¶ 11. We held that (1) when the defendant was acquitted, his jeopardy terminated, and (2) when the judge vacated the acquittal and continued the case for a second ruling, the defendant was subjected to a second jeopardy. *Cervantes*, 2013 IL App (2d) 110191, ¶ 59.

¶ 70                      3. *The Court Abused Its Discretion in Denying Defendant's Motion to Dismiss*

¶ 71       Having determined that the trial court ruled that the evidence was insufficient, we hold that the grant of a new trial violated defendant's right against double jeopardy. Because the court based its ruling on the merits rather than a procedural error, it was the equivalent of a vacatur of defendant's conviction and a judgment of acquittal. What constitutes an acquittal is not controlled by the form of the trial judge's action, but whether the judge's ruling, whatever its label, "actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977). Here, when the court in substance acquitted defendant, that acquittal terminated defendant's jeopardy. See *Cervantes*, 2013 IL App (2d) 110191, ¶ 59. Thus, when the court granted a new trial, defendant was again placed in jeopardy for the same offense.

¶ 72       As we have determined that the State was not bound to prove the date of the offense and that the evidence was sufficient to find defendant guilty beyond a reasonable doubt, the court's acquittal was erroneous. Nevertheless, under *Evans*, an erroneous acquittal is still an acquittal. *Evans*, 568 U.S. at 318. Accordingly, we hold that the court abused its discretion when it denied defendant's motion to dismiss on double-jeopardy grounds.

¶ 73                         III. CONCLUSION

¶ 74       For the foregoing reasons, we reverse the judgment of the circuit court of Kane County.

¶ 75       Reversed.