2025 IL App (1st) 230371-U
Nos. 1-23-0371 and 1-23-0372 (consolidated)

FIRST DIVISION
June 9, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 204006500 |
| | ) | No. 194004035 |
| JOHN T. BERAN, | ) | |
| | ) | The Honorable |
| Defendant-Appellant | ) | Eulalia De La Rosa, |
| | | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* (1) The State proved beyond a reasonable doubt that defendant committed the offenses of disorderly conduct and criminal damage to property. (2) The circuit court erred in ordering defendant to pay $450 in restitution without any evidentiary support.

¶ 2    Defendant John T. Beran appeals his conviction and sentence for disorderly conduct and criminal damage to property. He challenges the sufficiency of the evidence supporting his convictions for disorderly conduct and criminal damage to property, asserting that the State failed to prove his guilt beyond a reasonable doubt. He also argues that the circuit court erred in ordering him to pay $450 in restitution, as there was no evidentiary support for that amount. We affirm in

part and vacate in part, and remand the cause for the limited purpose of determining the appropriate amount of restitution.

¶ 3                                    BACKGROUND

¶ 4        The State charged defendant by misdemeanor complaint with one count of disorderly conduct (720 ILCS 5/26-1(a)(1) (West 2018)) and one count of aggravated assault (*id*. § 12-2(a)) in case No. 20MC4006500, as well as one count of criminal damage to property (*id*. § 21-1(a)(1)) in case No. 19MC4004035. All three charges arose from two interactions involving Cardell Hardiman. The matter proceeded to a bench trial.

¶ 5                                    Trial Evidence

¶ 6        Stephanie Sutton testified that on October 31, 2019, she was working as a special education teacher at St. Luke's Elementary School, and one of her duties that morning was to supervise the drop-off lane in front of the school. While directing traffic, she observed a disruption caused by defendant and Hardiman engaging in a heated conversation. Defendant was standing near the passenger door of Hardiman's car, yelling profanities at him. When Hardiman began to apologize, Sutton believed the exchange would deescalate. Defendant then punched the side-view mirror of Hardiman's car and asked Hardiman to exit his car.

¶ 7        On cross-examination, Sutton clarified that there were no vehicles in front of Hardiman's car. She recalled that the front passenger-side window of Hardiman's car was rolled down when she approached. She did not recall whether she approached from the front or the rear of the vehicle. She stated that when she first recognized the conversation was heated, she momentarily stepped back, as it was not her role to intervene. She clarified that she did not hear the start of the conversation.

¶ 8  Cardell Hardiman testified that on the morning of October 31, 2019, he was driving his children to school. He drove a midsize sport utility vehicle ("SUV"). As Hardiman made the right turn on Ashland, defendant was in the middle of the street, pointing downward with his hands. As Hardiman approached, he slowed down, although he clarified that he had not been driving very fast. Hardiman estimated that he was only driving approximately 10 to 15 miles per hour. He rolled down his window because defendant was saying something. Defendant yelled at him, "Slow the f*** down." Defendant blocked the path of Hardiman's vehicle. Hardiman stated, "There was no way I could have gone around him without striking him." He apologized to defendant. Hardiman testified that his vehicle did not make contact with defendant.

¶ 9  Hardiman then proceeded to drop his children off at the school. While waiting for the other cars to move, defendant approached his vehicle. Hardiman rolled down his window, assuming defendant was going to apologize. The two began talking over one another, and Hardiman admitted that he was not listening to what defendant was saying. He repeatedly asked defendant, "Did you hear what I said to you?" Eventually, defendant stopped talking and responded, "No, what did you say?" Hardiman then apologized. He clarified that, although he did not believe he was at fault, he apologized in an effort to deescalate the situation.

¶ 10  Defendant responded, "Say no more," and shook hands with Hardiman. Hardiman held defendant's hand and said, "You know, we don't act like this. This will not happen again." He also told defendant, "We're adults." Defendant released Hardiman's hand and yelled, "F*** you. You threatening me?" Hardiman did not threaten defendant and did not intend for his words to be threatening. Hardiman testified that his tone of voice during the interaction was similar to the tone he used while testifying. Hardiman then rolled up the window of his vehicle. Defendant slammed his middle finger on the passenger window and Hardiman started nervously laughing. Defendant

then punched the passenger side mirror, which damaged the mirror. Hardiman drove away. The side mirror had a scratch and no longer functioned properly. The court admitted State's Exhibits 1-3 which showed a scratch on the rear of the passenger side mirror.

¶ 11    On cross-examination, defense counsel asked, "Did you think at the time or any time after that, that he may have been instructing you to drive slower by pointing downwards?" Hardiman responded, "Never happened to me before. I have nothing to compare it to. I have an excellent driving record." Defense counsel asked the question two additional times, and Hardiman responded that he had never thought about it. He clarified that when he drove away, defendant was positioned on the passenger side of his vehicle. During their second interaction, defendant never approached the driver's side or the front of the vehicle and did not make any verbal threats. Defense counsel asked, "And were you afraid of him because during that first [interaction] you struck him as you drove away." Hardiman answered, "No." Hardiman testified that both interactions occurred within approximately five minutes of each other. On redirect, the State asked Hardiman how long he and defendant shook hands. Hardiman testified, "It was nothing. It wasn't an abnormal time, where it's like, you know, I'm holding someone's hand, you know. It's nothing more than a handshake."

¶ 12    Following Hardiman's testimony, the State rested. Defense counsel moved for a directed verdict. The Court granted the motion as to the aggravated assault count.

¶ 13    Nellie Gamino testified that on the morning of October 31, 2019, while dropping her child off at St. Luke's Elementary School, she witnessed an interaction between defendant and Hardiman. Hardiman was driving north on Ashland Avenue, and defendant was crossing Ashland from the west side to the east. Gamino was walking north on the east side of the street, heading

toward the spot where defendant was crossing, approximately two car lengths away. Gamino did not observe how fast Hardiman was initially driving.

¶ 14      Defendant yelled at Hardiman to slow down, stating that it was a school zone and that Hardiman had nearly hit defendant's child. Hardiman partially opened his car door, and he and Defendant exchanged words, but Gamino could not hear what was said. Gamino testified "Then [the car] like zoomed again, and took off forward. That's when I saw that, you know, [defendant's] body went like this. I was like oh my god, he just hit him." Gamino asked defendant whether he was alright, and he responded "He just hit me." A crossing guard who was also present asked defendant the same question. Gamino described defendant as upset and in disbelief.

¶ 15      On cross-examination, Gamino clarified that defendant was crossing the street slightly before the crosswalk. She described Hardiman's car as traveling faster than what would be expected in a school zone. Although she did not actually see the car make contact with defendant, she observed his body move forward simultaneously with the car's movement and described it as "just like when you get swiped." She stated that she had not spoken with defendant about the case and only learned it was set for trial when defense counsel contacted her to testify. On redirect, she reiterated that she was dropping off a friend's child at the school and had no other connection to the school.

¶ 16      Detective James Cromley testified that on the morning of November 1, 2019, he interviewed Hardiman. Hardiman told Cromley that defendant stepped out into the roadway on the morning of October 31, 2019. Hardiman slowed his vehicle to avoid hitting defendant. Defendant told Hardiman to slow down. After an exchange of words between Hardiman and defendant, Hardiman veered around him, and the vehicle's side mirror struck defendant's elbow. Hardiman

stated that defendant had extended his elbow outward. Cromley gathered that Hardiman believed defendant had intentionally positioned himself to be struck by the vehicle.

¶ 17    While in the drop-off lane, Hardiman saw defendant and preemptively rolled down his window to speak with him. He said, "I don't know if you heard me, but I'm sorry." Hardiman had previously apologized during their initial interaction. Before Hardiman would shake defendant's hand, he instructed defendant to fold the side mirror back out.

¶ 18    Defendant testified that on the morning of October 31, 2019, he was dropping his son off at St. Luke's Elementary School. He explained that he always parks on Ashland and walks his son across the street to the school. As they crossed Ashland that day, a gray SUV "barreled down on [them]." Defendant estimated that the SUV was traveling approximately 30 miles per hour in a school zone. The vehicle came to a stop within four or five feet of them. At the time, they were about 15 feet from a stop sign. Defendant pointed at the school zone sign and the stop sign and said, "You're in a school zone." His son continued toward the sidewalk. When Hardiman rolled down his window, defendant told him, "Slow the f*** down. You're in a school zone." Hardiman responded, but defendant could not hear exactly what he said; however, he recalled that Hardiman responded aggressively. Defendant testified, "It wasn't an appropriate, oh, I'm sorry. You're right. I'm in a school zone."

¶ 19    Defendant testified that other vehicles were parked along the east side of the street, and he was positioned within a few feet between Hardiman's SUV and the parked vehicles. Defendant testified that as he turned eastbound to continue walking, Hardiman "basically just kind of guns it and smacks [him] with the side of his car, throwing [him] forward." He clarified that Hardiman "struck [his] back, basically, and my arm." Once he reached the sidewalk, he noticed Gamino and the two discussed the incident. Defense counsel asked, "At that time what was your mental state?"

Defendant replied, "Pissed off. What do you mean? I just got hit by a car by a p**** that was driving entirely too fast in a school zone. I mean, luckily it was me and not a child." Defense counsel followed up by asking, "How did the fact that your son or child was with you effect that?" Defendant responded, "Well, I don't know. How would any parent feel if somebody was driving erratic and at a high rate of speed and almost runs you and your child over? Even more so your child. I think I was very protective and upset, as any parent would be."

¶ 20        Defendant then dropped his son off at school and began walking back toward his vehicle. He noticed Hardiman, who rolled down his window and said, "My bad." Defendant again told Hardiman that he was in a school zone and needed to slow down. Hardiman put out his hand. Defendant testified that he thought to himself, "All right, you know, he made a mistake that he's willing to man up to." Defendant then decided to unfold Hardiman's mirror, and the two shook hands. Hardiman did not release his grip immediately; instead, he held onto defendant's hand. Hardiman then said, "You're lucky my kids are in the car," and added, "Where I come from people get shot for s*** like that." Defendant clarified that Hardiman may not have used profanity, but the second statement was to that effect. Regardless, defendant felt threatened.

¶ 21        Defendant pulled his hand back, gave Hardiman the middle finger, and struck the side mirror closed with an open hand. At that moment, a teacher from the school approached and reminded him that he was standing in front of an elementary school. He acknowledged the reminder and walked away. He testified that he does not wear jewelry due to a medical condition and the nature of his work as an electrician. He testified that if he had intended to break the mirror off the car, he would have kicked it. He later called his attorney and believed his attorney reported the incidents to the River Forest Police.

¶ 22 During cross-examination, the record reflects that defendant was agitated and curt with the State's Attorney. He testified that he was not blocking the path of Hardiman's vehicle. He clarified that he was on the east side of the street, positioned against the parked cars and on the passenger side of Hardiman's vehicle.

¶ 23 Following defendant's testimony, the defense rested. The parties delivered their closing arguments, and the court called a brief recess.

¶ 24 The court noted that it found all the witnesses except for defendant to be credible. The court stated:

> "So, during the defendant's testimony, one thing that as judges, as triers of fact, we are observing witnesses. We are observing their demeanor. We are observing how they present. It goes to the credibility. The defendant throughout his testimony became increasingly frustrated, agitated, condescending at times with the State's Attorney's questioning, increasingly verbally aggressive. I saw that here in the 15 minutes that he was up here testifying in this controlled environment where even if I just didn't tell you I could have that deputy take you into custody, I think you are smart enough that you know that. And those are the behaviors, that's what you showed here in court to me. So when I'm thinking about who I do find more credible about how they behaved that morning at a crosswalk in front of a school dropping off their children, I do not find you credible. What you demonstrated here in court with your demeanor was a—shows me that you do have an anger problem and a lack of self control.
>
> So, do I believe the complaining witness and what he shared with the Court the last court date? Very much so.
>
> That being said, for the disorderly conduct I went back and forth on disorderly conduct. Had it just ended with the first interaction, had it even just ended with you approaching his vehicle when he's in a car and you're walking, you should have just walked to your car and gone home. Talking about you're trying to be the adult in this, but you didn't. You walked up to his car and his children were still in the car. Do I believe that he held your hand there for such a long time and wouldn't let you go? Absolutely not. Do I believe that you said words to him? 100 percent. Do I believe that you were inappropriate, that you were out of line, that you were disturbing the peace, that you were acting unreasonable? 100 percent. You show it here. It is unreasonable behavior in a school crossing zone where children are present, people are just dropping their kids off for you to be cursing like that at somebody, for you to be flicking the finger at their car window, for you to damage his mirror."

¶ 25    The court noted that defendant did not have a criminal background and sentenced him to two concurrent terms of 12 months' court supervision and anger management classes. The court also ordered defendant to pay $450 in restitution to Hardiman, despite no evidence being presented at sentencing regarding the amount of Hardiman's losses. Defendant filed notices of appeal in case Nos. 20MC4006500 and No. 19MC4004035, which were subsequently consolidated on appeal.

¶ 26                                    ANALYSIS

¶ 27    On appeal, defendant challenges the sufficiency of the evidence supporting his convictions for disorderly conduct and criminal damage to property, asserting that the State failed to prove his guilt beyond a reasonable doubt. As to the disorderly conduct conviction, he argues that the State failed to establish that his conduct was unreasonable. With respect to the criminal damage to property conviction, he contends that the State failed to prove that his act of striking the side mirror caused the damage. He further argues that the circuit court erred in ordering him to pay $450 in restitution, as there was no evidentiary support for that amount.

¶ 28                            Sufficiency of the Evidence

¶ 29    When a defendant makes a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." *Collins*, 106 Ill. 2d at 261. Thus, "the reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). "This standard of review applies

regardless of whether the evidence is direct or circumstantial and regardless of whether the defendant received a bench or jury trial." *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 36.

¶ 30    It is the responsibility of the fact finder to determine the weight to be given to the witnesses' testimony, assess their credibility, and draw reasonable inferences from the evidence. *People v. Pryor*, 372 Ill. App. 3d 422, 429 (1st Dist. 2007). "The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *People v. Hall*, 194 Ill. 2d 305, 330 (2000). "[I]n weighing evidence, the trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). "A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 31                                    *Disorderly Conduct*

¶ 32    Defendant argues that the State failed to prove him guilty beyond a reasonable doubt of disorderly conduct because it did not establish that his conduct was unreasonable. In making this argument, defendant challenges the circuit court's credibility determinations, pointing to alleged inconsistencies in the trial evidence. In essence, he asks this court to accept his version of events and reject Hardiman's, which is directly contrary to the findings of the circuit court. The State responds that defendant's argument is ultimately a request for this court to reevaluate the credibility of the witnesses.

¶ 33    "A person commits disorderly conduct when he or she knowingly does any act in such *unreasonable* manner as to alarm or disturb another and to provoke a breach of the peace."

(Emphasis added.) 720 ILCS 5/26-1(a)(1) (West 2018). "To prove defendant guilty of the offense of disorderly conduct, the State must prove that defendant (1) knowingly did any act (2) in such an unreasonable manner (3) as to alarm or disturb another and (4) to provoke a breach of the peace." *People v. Singer*, 2021 IL App (2d) 200314, ¶ 44. Disorderly conduct is defined not solely by the nature of the act but by the surrounding circumstances in which it occurs. *People v. McLennon*, 2011 IL App (2d) 091299, ¶ 30. Reasonableness is an objective standard, but it is assessed in light of the defendant's conduct within the context of the surrounding circumstances. *Id*. ¶ 32.

¶ 34        "It is for the trier of fact to resolve any inconsistencies in the testimony, and the trier of fact is free to accept or reject as much or as little as it pleases of a witness' testimony." *People v. Logan*, 352 Ill. App. 3d 73, 80-81 (1st. Dist 2004). "A trial court's credibility determinations are entitled to great deference, and they will rarely be disturbed on appeal." *People v. Clark*, 2014 IL App (1st) 130222, ¶ 26. "Where findings of fact depend on the credibility of witnesses, a reviewing court will defer to the findings of the trial court unless they are against the manifest weight of the evidence." *Id*. "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Id*.

¶ 35        We agree with the State that defendant's argument on appeal essentially asks this court to reweigh the credibility of the witnesses. Defendant points to several inconsistencies in the trial testimony, but it was the role of the circuit court to resolve those inconsistencies. In doing so, the court was free to accept or reject as much or as little of each witness's testimony as it found credible. It is not our role to retry the defendant or substitute our judgment for that of the trial court. Rather, we must view the evidence in the light most favorable to the State and defer to the

circuit court's factual findings, particularly following a bench trial. Here, the circuit court expressly stated that it believed all of the witnesses except for defendant, and it provided specific reasons for discrediting his version of events, including his demeanor and behavior during trial.

¶ 36    The circuit court seemingly acknowledged that no one would fault a parent for reacting emotionally during the first interaction, where, from defendant's perspective, Hardiman may have placed him and his child in danger. The court noted that it may not have found defendant guilty of the disorderly conduct charge had the case been based solely on that initial encounter. However, the court concluded that defendant's conduct during the second interaction was unreasonable, even when considered in light of the totality of both interactions.

¶ 37    Defendant focuses on inconsistencies in Hardiman's account, particularly the fact that Hardiman testified at trial that his car did not make contact with defendant, while telling Officer Cromley that it had. However, as the finder of fact, the circuit court did not need to believe all of Hardiman's account from both interactions to find that there was sufficient evidence that defendant was guilty of disorderly conduct. In this regard, we recognize there was testimony from other witnesses that appeared to corroborate defendant's claim that Hardiman's car did in fact contact defendant during the initial interaction. Such testimony contradicted Hardiman's denial that his car touched defendant. Nonetheless, whether or not Hardiman's car made contact with defendant during the initial interaction was not dispositive as to whether defendant's subsequent conduct was unreasonable, for purposes of assessing proof of the disorderly conduct offense. The trial court's comments reflect that, regardless of what happened during the first interaction, it found defendant acted unreasonably during the second interaction. Significantly, defendant admitted that he became angry, made an obscene gesture, and struck Hardiman's car mirror at that time. The trial court was entitled to find that this conduct by defendant, which occurred in front of an elementary school,

was unreasonable, whether or not it believed Hardiman's denial that his car previously made contact with defendant.

¶ 38    In reaching its verdict, the circuit court focused primarily on the second interaction. It found that defendant knowingly approached Hardiman and escalated a second confrontation, even after Hardiman had apologized for any role he may have played in the earlier encounter. Notably, Hardiman, Sutton, and defendant all testified that Hardiman apologized during the second interaction. Despite this, defendant proceeded to yell profanities, make obscene gestures, and punch the side mirror of Hardiman's vehicle, all in front of young children, other parents, and school staff. The court concluded that defendant's conduct during the second incident was not reasonable. Instead, as the court put it, his behavior displayed a lack of self-control. This lack of self-control was also evident during defendant's testimony, further supporting the court's decision to discredit his account.

¶ 39    Ultimately, this case presented two competing versions of events, one from Hardiman and the other from defendant. The circuit court resolved that conflict by finding Hardiman and the other witnesses credible and rejecting defendant's version based on his behavior and demeanor. Simply put, the court found all of the witnesses credible except for defendant. Viewing the evidence in the light most favorable to the prosecution, the evidence was sufficient to establish beyond a reasonable doubt that defendant's conduct was unreasonable.

¶ 40    *Criminal Damage to Property*

¶ 41    Defendant argues that the State failed to prove beyond a reasonable doubt that his act of striking the side mirror caused the damage.

¶ 42    A person commits criminal damage to property when he or she knowingly damages any property of another. 720 ILCS 5/21-1(a)(1) (West 2018). A criminal conviction may be based

solely on circumstantial evidence. *People v. Brown*, 2013 IL 114196, ¶ 49. "Circumstantial evidence is proof of facts that give rise to reasonable inferences of other facts that tend to establish guilt or innocence of the defendant." *People v. Johnson*, 2018 IL App (1st) 150209, ¶ 19. We apply the same standard of review when defendant makes a challenge to the sufficiency of the evidence "regardless of whether the evidence is direct or circumstantial." *People v. Norris*, 399 Ill. App. 3d 525, 531 (2010).

¶ 43     In making this argument, defendant again asserts that his version of events was more credible than Hardiman's and that the mirror was most likely damaged when Hardiman allegedly struck him with his vehicle. The circuit court, however, rejected defendant's testimony and accepted Hardiman's account. Regardless of whether the court believed Hardiman struck defendant with his vehicle after the first interaction, it was permitted to reasonably infer that the damage to the mirror occurred during the second interaction, when defendant admitted to striking it.

¶ 44     Viewed in the light most favorable to the prosecution, the evidence was sufficient to prove beyond a reasonable doubt that defendant's act of striking the mirror caused damage.

¶ 45                                      *Restitution*

¶ 46     Defendant argues that the circuit court erred in ordering him to pay $450 in restitution, as there was no evidentiary support for that amount. He admits that he did not preserve this error for review but argues for reversal under second prong plain error.

¶ 47     Whether a forfeited claim is reviewable under the plain-error doctrine is a question of law, which is reviewed de novo. *People v. Johnson*, 238 Ill. 2d 478, 485 (2010). Under the plain-error doctrine, a reviewing court may consider an unpreserved error when either: (1) a clear or obvious error occurred and the evidence was so closely balanced that the error alone could have tipped the

scales of justice against the defendant, or (2) a clear or obvious error occurred that was so serious it affected the fairness of the trial and undermined the integrity of the judicial process, regardless of the strength of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). "The initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 48    It is well established that a trial court is authorized to order restitution as part of a defendant's sentence in any criminal case. 730 ILCS 5/5-5-6 (West 2022). Still, the circuit court must evaluate the actual costs incurred by the victim and cannot rely on conjecture or speculation as to the amount to be awarded. *People v. Birge*, 2021 IL 125644, ¶¶ 47-48. We review a circuit court's restitution order for an abuse of discretion. *People v. Stites*, 344 Ill. App 3d 1123, 1125 (4th Dist. 2003). "[A]n abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 49    Here, the State concedes that the circuit court abused its discretion by ordering a restitution amount of $450 without any evidentiary support. However, the State claims that defendant invited this error by not objecting at the sentencing hearing. This argument lacks merit. See *People v. Spencer*, 2014 IL App (1st) 130020, ¶¶ 26-28 (a failure to object results in forfeiture, not invited error). Furthermore, our supreme court has held that a claim challenging the evidentiary basis of a restitution order is reviewable under the second prong of the plain-error doctrine. *Birge*, 2021 IL 125644, ¶ 44. Accordingly, we vacate the restitution order and remand this case for the limited purpose of determining the proper restitution amount.

¶ 50                              CONCLUSION

¶ 51    For the reasons stated above, we affirm defendant's conviction and sentence. We vacate the portion of the court's sentencing order imposing $450 of restitution and remand the case for the limited purpose of determining the proper restitution amount.

¶ 52    Affirmed in part and vacated in part. Cause remanded.