2023 IL App (2d) 220190
No. 2-22-0190
Opinion filed July 26, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-198 |
| MATTHEW P. BRENNAN, | ) ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Presiding Justice McLaren and Justice Jorgensen concurred in the judgment and opinion.
Presiding Justice McLaren also specially concurred, with opinion.

**OPINION**

¶ 1    Following a bench trial, the defendant, Matthew Brennan, was convicted of three counts of

child abduction under sections 10-5(b)(1) and (b)(5) of the Criminal Code of 2012 (Code) (720

ILCS 5/10-5(b)(1), (b)(5) (West 2018)), arising from his repeated refusals to return his daughters

to their mother, Tara M., after (a) the expiration of his permitted visits and (b) the entry of a court

order requiring him to return them "immediately." He appeals, arguing that the evidence was

insufficient to convict him, the trial court committed certain evidentiary errors, and he received

ineffective assistance of counsel. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Matthew and Tara are the parents of two daughters, born in 2008 and 2013. Matthew and Tara divorced in 2017, and the judgment of dissolution included a parenting plan. Pursuant to the terms of that parenting plan, the girls lived with Tara. Matthew lived in Minnesota. Under the parenting plan, Matthew was to have parenting time with the girls during spring break in alternate years, beginning at 5 p.m. on the last day of school before the break and ending at 5 p.m. on the day before school was to restart. Each party was also entitled to "three (3) non-consecutive one-week periods of extended parenting time in the summer months." The parties were to notify each other of their desired weeks by May 1 each year. Finally, Matthew was entitled to spend Father's Day from 9 a.m. to 5 p.m. with the girls every year. As to the location of the visits, the parenting plan provided that, "[i]n the event that [Matthew's] periods of parenting time exceed 96 hours, he may exercise it in Minnesota." The parties were to communicate with each other only via text or e-mail.

¶ 4    The following facts were established at trial. On March 6, 2020, Matthew texted Tara to say that he wanted parenting time with the girls in Minnesota over spring break from March 20 (the last day of school before break) through March 30 (the Monday that school resumed), and also wanted the first two weeks of summer vacation. Tara responded that he could pick up the girls at 4 p.m. on March 20 but must return them by 6 p.m. on March 29, the day before school resumed. She did not respond or agree to his request about summer vacation.

¶ 5    On March 20, 2020, Matthew arrived early, picking up the girls at 9 a.m. Pursuant to the terms of the parenting plan, Matthew was to return them by 5 p.m. on Sunday, March 29. He did not do so, instead keeping them in Minnesota.

¶ 6    In May of that year, Tara filed, in the divorce case, an emergency petition for the return of the children, alleging that Matthew was continuing to keep them in Minnesota contrary to the terms

of the parenting plan and judgment. On June 4, 2020, the court granted the petition, ordering "that the minor children *** shall be turned over to [Tara]" and that Matthew must "immediately turn over the minor children to Tara *** upon presentation of this Order." The order also directed the sheriff, local police department, and all other local authorities to "assist in the transfer" of the children from Matthew to Tara.

¶ 7     Matthew was served with the June 4, 2020, order in Minnesota on June 5, 2020. He did not return the children to Tara. Instead, a few days later on June 8, he took the girls to the Wisconsin Dells. Tara learned he was there and retrieved her daughters in the presence of law enforcement.

¶ 8     Only a few weeks later, on June 21, 2020, Matthew exercised his Father's Day parenting time, picking up the girls in Illinois. Without Tara's permission, and against the terms of the parenting plan, he took them to Minnesota and kept them there. The girls were not returned to Tara until September 2020.

¶ 9     On July 30, 2020, Matthew was charged with three counts of child abduction. Count I charged him with violating the terms of the June 4, 2020, court order by concealing or detaining the children in violation of section 10-5(b)(1) of the Code (720 ILCS 5/10-5(b)(1) (West 2018)). The other two counts charged that, as of June 5, 2020 (count II), and July 14, 2020 (count III), Matthew had violated section 10-5(b)(5) of the Code (*id.* § 10-5(b)(5)) by failing to return the children to Tara after the expiration of visitation rights outside of Illinois.

¶ 10     The bench trial on the charges took place on February 1, 2022. The State's first witness was Yorkville police officer Dennis Meyer. He testified that, on June 22, 2020 (the day after Matthew took the children for Father's Day), he was assigned to investigate the dispute between Tara and Matthew regarding the children's return to Illinois. Tara e-mailed him a document stating that, on June 5, 2020, a Minnesota deputy sheriff had personally served Matthew with the June 4,

2020, order. Meyer tried to contact Matthew unsuccessfully more than once. On June 24, 2020, he received a telephone call. A male voice identified himself as "Matt Brennan" and discussed the parenting time arrangements involving Tara and the girls. Meyer asked the caller if he was served with a court order by the police in Minnesota, and the caller indicated that he was served, and he said that he did not return the children on June 5 because there were problems communicating with Tara to arrange the exchange. Meyer spoke with Matthew on several other occasions during the investigation, and it was always the same voice, and they always discussed Tara and the children.

¶ 11    The State tendered a copy of the e-mail document regarding service of the order on Matthew for admission into evidence. The defense objected that it was hearsay. The State responded that it was being offered not for the truth of the matter asserted (*i.e.*, that Matthew was in fact served with the order in Minnesota on June 5, 2020), but to show why Meyer asked the caller who identified himself as Matthew about whether he had received the order. The trial court admitted the document over objection.

¶ 12    Tara was the State's other witness. As to the spring break visit, Tara testified that she agreed only to parenting time ending at 6 p.m. on March 29, the day before school resumed. However, after Matthew picked up the girls, he threatened to keep them. Tara responded that, if he did so, she would contact law enforcement. Nevertheless, Matthew kept the girls, causing them to miss the remainder of the school year at their Yorkville schools. Because of the lockdowns imposed after the onset of the COVID-19 pandemic, the police did not take action. Tara therefore filed, in the divorce case, an emergency petition for the return of the children.

¶ 13    After the trial court issued the June 4, 2020, order requiring Matthew to immediately turn over the children, Tara contacted law enforcement in Minnesota about the order. She received an

e-mail stating that Matthew had been served with a copy of the order on June 5, 2020. She later forwarded the e-mail to Meyer.

¶ 14    Tara drove to Minnesota on June 6, but she was not able to make contact with her children or Matthew, although she knew where he lived. She did not learn where Matthew and the children were until June 8, when a Minnesota police officer told her that they had gone to the Wisconsin Dells. With the help of law enforcement, she was able to retrieve the children there.

¶ 15    As for the visit commencing on June 21, Tara testified that she had no advance warning that Matthew intended to exercise his Father's Day parenting time until he arrived at noon that day. Tara told him to have the girls home by 5 p.m. and did not agree that he could visit with them for longer. However, Matthew did not return the girls that day and instead brought them to Minnesota, keeping them there until September 26. Tara called the girls daily during that time, as permitted under the parenting plan, but she was able to speak with them only a small percentage of the time.

¶ 16    Tara testified that at no point did Matthew identify a date or time when he would return the girls. She never agreed that Matthew could have parenting time for the first three consecutive weeks of the summer. She specifically denied that there was ever a plan or agreement to exchange the girls on July 12. On July 13, she texted Matthew to suggest a time, place, and date for him to return the girls, but Matthew did not respond. Tara next suggested that they exchange the girls on July 20 at a specific place and time, but Matthew responded only by calling her "the biggest liar I have ever" [*sic*]. On July 20, Tara drove to the exchange point she had suggested, but Matthew and the girls never appeared. Matthew then initiated legal proceedings in Minnesota seeking a change of custody. It was not until after those proceedings that Tara was able to get the girls back. By then, they had missed the first month of school.

¶ 17    On cross-examination, the defense asked if Tara was blocking text messages from Matthew in the days leading up to June 8, 2020. Tara denied blocking Matthew's texts and said that she did not even know how to block someone at that point. On redirect, Tara testified that she had no communication with Matthew on June 6, 2020. On recross, the defense asked whether she had any communication with Matthew "between June 5 and June 6." The State objected that the question was beyond the scope of redirect, and the trial court sustained the objection. The defense then asked Tara whether she made contact with Matthew on June 6, and Tara again said no.

¶ 18    The State asked the trial court to take judicial notice of executive orders relating to COVID-19 travel precautions issued by the governors of Illinois and Minnesota, both of which made exceptions to the travel bans for "the transport of children pursuant to existing parenting time schedules." The trial court granted the State's request over objection by the defense.

¶ 19    Prior to the start of Matthew's case, the defense asked to recall Meyer to the stand, saying that Meyer could impeach Tara's testimony that she had never blocked Matthew's texts, because Meyer could testify that Tara had told him that she did block Matthew's texts. The State objected that Meyer's testimony would not be impeaching, because the defense had never asked Tara whether she told Meyer that she blocked Matthew's texts. Because Meyer's potential testimony pertained only to what Tara had told him, and Tara had never been asked about what she told Meyer, there was no "inconsistent statement" and the defense had not perfected the foundation for impeachment. The trial court denied the defense's request to recall Meyer.

¶ 20    The sole witness for the defense was Matthew. He acknowledged the terms of the parenting plan. As for making arrangements for exchanging the children, he testified that communication with Tara was never easy and that he was in communication with Tara "at any time she wanted to communicate with me or my daughters." Matthew stated that, through texts and phone calls, the

parties agreed that he could keep the girls beyond the end of spring break and for the first three weeks of the summer. However, he could not identify any such agreement in the parties' texts. He asserted that he was trying to coordinate returning the girls with Tara "after the COVID-19 stay-at-home order was lifted." He believed that the Minnesota COVID-19 order included a travel ban, but he admitted that he never read the stay-at-home orders.

¶ 21   Matthew testified that law enforcement officers arrived at his home on June 5, 2020, and gave him some "paperwork" that he described as "deemed not accepted in Minnesota." He did not explain what he meant by that. The paperwork included what appeared to be a court order, but he "wasn't quite clear what the order was." He then began texting Tara to attempt to set up a time and place for the exchange. Matthew asserted that Tara texted him questions that he responded to, but Tara later texted that she had not received any answers from him. He believed that this fact, which he documented with printouts of the parties' text messages, established that Tara was blocking his texts. He testified that, although Tara repeatedly tried to arrange to pick up the girls at a police station on June 7, he did not want to do the exchange on that day. He did not identify any texts in which he told Tara that he would return the girls to her at the Wisconsin Dells on June 8, 2020.

¶ 22   As for the holdover on his Father's Day visit (the basis for count III, which charged that on or about July 14, 2020, he failed to return the girls after the expiration of his visitation rights outside of Illinois), Matthew testified that (a) he was permitted to have the girls through July 12, as Tara had agreed that he could have them for three consecutive weeks at the start of the summer; (b) he and Tara "were supposed to meet for an exchange" on July 12, but she did not show up at the meeting place and later texted him a message "Omg drank…don't know anything anymore," which he interpreted as her being drunk; and (c) Tara then texted him to arrange to exchange the girls on July 17 or on July 20, which Matthew believed was permission for him to keep the girls

until those dates. Thus, he argued in closing, his agreed parenting time with them had not expired as of July 14.

¶ 23    The trial court found Matthew guilty on all counts. It began by saying that it found the testimony of Meyer and Tara to be credible. As to Matthew's testimony, however, the trial court noted that he frequently refused to answer questions that were asked and instead "editorialized," making the statements that he preferred to make. During his testimony, Matthew also misquoted the language of the parenting plan in a manner that favored him, despite being asked to read it verbatim. In sum, the trial court stated, "I don't find [Matthew's] testimony to be credible whatsoever."

¶ 24    The trial court also found that the parenting plan clearly provided that Matthew was to return the children by 5 p.m. on Father's Day. Although Matthew contended that there was an agreement that he could keep the girls for three consecutive weeks of parenting time in Minnesota, there was no evidence to support that contention. The trial court further found that there was no evidence to support Matthew's speculation that Tara was intentionally blocking his text messages in early June 2020. Finding that the State had proved each element of the charged offenses, the trial court found Matthew guilty of all counts.

¶ 25    Matthew filed a posttrial motion for a new trial, contending among other things that the evidence did not prove him guilty beyond a reasonable doubt; that he was deprived of due process because the charging instrument indicated to him that counts II and III were premised on his actions on the specific dates of June 5 and July 14, 2020, not on his ongoing failures to return the children after his spring break and Father's Day visits, thereby denying him a fair opportunity to prepare a defense; and that the trial court erred in barring the defense from recalling Meyer as a witness in its case. The trial court denied the motion, merged the conviction on count II into the conviction

on count I, and sentenced Matthew on counts I and III to 120 days' imprisonment and 24 months' probation. This appeal followed.

¶ 26                                  II. ANALYSIS

¶ 27     On appeal, Matthew raises four arguments: (1) that the evidence was insufficient to support his convictions, (2) that the trial court abused its discretion in refusing to allow him to recall Meyer in his case, (3) that the trial court abused its discretion by allowing the admission of evidence about other bad acts by Matthew, and (4) that his trial counsel was ineffective in various ways. We examine each argument in turn.

¶ 28                          A. Sufficiency of the Evidence

¶ 29     Matthew claims that the State failed to prove him guilty beyond a reasonable doubt on each count. However, he fails to establish that this is so.

¶ 30     In evaluating the sufficiency of the evidence, it is not the province of this court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The relevant question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The weight to be given to the witnesses' testimony, the determination of their credibility, and the reasonable inferences to be drawn from the evidence are all matters within the jurisdiction of the trier of fact. *People v. Smith*, 185 Ill. 2d 532, 542 (1999); *Collins*, 106 Ill. 2d at 261-62. Likewise, the resolution of any conflicts or inconsistencies in the evidence is also within the province of the fact finder. *Collins*, 106 Ill. 2d at 261-62. We will set aside a criminal conviction only "where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *Smith*, 185 Ill. 2d at 542.

¶ 31                                    1. Count I

¶ 32    Count I charged Matthew with violating the terms of the June 4, 2020, court order by detaining and concealing the children. That count was based on section 10-5(b)(1) of the Code, which provides that a person commits child abduction when he or she "[i]ntentionally violates any terms of a valid court order granting *** possession to another by concealing or detaining the child." 720 ILCS 5/10-5(b)(1) (West 2018). The State presented evidence that Matthew was served with the order requiring immediate turnover of the children on June 5, but he did not return the children that day, or on June 6, or on June 7. The children were not returned to Tara until June 8, the day that she caught up with Matthew in Wisconsin. This evidence was sufficient to support his conviction on this count.

¶ 33    Matthew first asserts that the State did not prove that he intentionally violated the court order because there was no evidence that he received the order, that he knew the order was valid, or that he understood its terms. None of these arguments has merit. Meyer testified that a man identifying himself as Matthew admitted receiving the turnover order on June 5, and Matthew himself conceded at trial that he had been served with a court order on June 5. The trial court was permitted to draw the reasonable inference from this evidence that Matthew received the turnover order on June 5. Nor did Matthew have any reason to doubt the validity of the order, which was issued under the case name and number of his divorce proceeding. Finally, the order was not complex or unclear: it ordered Matthew to "immediately turn over the minor children to Tara" and stated that law enforcement authorities were to assist in the return of the children. The trial court reasonably found not credible Matthew's self-serving testimony that he was not "quite sure" what the order meant. We will not second-guess the trial court's credibility determinations. See *Smith*, 185 Ill. 2d at 542; *Collins*, 106 Ill. 2d at 261-62.

¶ 34    Matthew also argues that he did not know where or how to return the children to Tara, but this argument too is meritless. Regardless of whether Matthew was able to reach Tara via text message, he did not lack options. Faced with a court order advising him that law enforcement officers were authorized to assist in returning the children to Tara, he could simply have handed the children over to the officers who appeared at his door on June 5. Nor was it "impossible," as he argues, for him to return the children to Tara at her home in Illinois on June 5. After all, that is where he picked them up on March 20 and again on June 21, demonstrating that he was well able to make that several-hour journey with them whenever he chose. We reject Matthew's arguments as to count I.

¶ 35                                   2. Count II

¶ 36    Although Matthew raises arguments regarding his conviction on count II, the State correctly notes that we cannot entertain an appeal of that conviction. Prior to sentencing, the trial court merged the conviction on count II into the conviction on count I, and it expressly sentenced Matthew on count I and not on count II. We cannot review a conviction on which no sentence was imposed, as there is no final judgment. *People v. Caballero*, 102 Ill. 2d 23, 51 (1984) ("The final judgment in a criminal case is the sentence, and, in the absence of a sentence, an appeal cannot be entertained.").

¶ 37    Matthew cites *People v. Dixon*, 91 Ill. 2d 346 (1982), for the proposition that an appellate court can remand a merged-and-unsentenced conviction for sentencing if it vacates the merged conviction on which sentence was imposed. Thus, if we had determined that Matthew's conviction on count I must be reversed, *Dixon* would allow us to remand count II for resentencing. *Dixon* has no application here, however, as we have not reversed Matthew's conviction on count I. We therefore dismiss the appeal as to count II.

¶ 38                                3. Count III

¶ 39    Count III charged that, "on or about July 14, 2020," Matthew committed the offense of child abduction in violation of section 10-5(b)(5) of the Code in that he failed to return the children to Tara after the expiration of visitation rights with them outside the State of Illinois. 720 ILCS 5/10-5(b)(5) (2018). At trial, Matthew's defense centered on proving that he did not intentionally fail to return the children to Tara on the exact dates listed in the indictments—attempting to show, for instance, that Tara had consented to his having the girls on July 14. The State, by contrast, treated count III as charging an ongoing offense, with July 14 simply being one date during Matthew's continuing failure to return the girls after the expiration of his permitted Father's Day visit. The State therefore introduced evidence regarding Matthew's entire course of conduct with respect to his scheduled visits and the entire length of time that he wrongly kept the children after the expiration of those visits.

¶ 40    In his posttrial motion before the trial court, Matthew argued that he was deprived of due process in that the charging instruments were drafted in such a way that they caused him to focus his defense only on his conduct on the two specific dates, June 5, 2020, and July 14, 2020, thereby hindering his ability to prepare a defense to the State's broader approach. The trial court rejected this argument. On appeal, Matthew's opening brief did not list, as an issue, any claim that his ability to prepare a defense to count III was prejudiced because the charge against him listed the specific date of July 14, 2020, rather than the full range of dates during which he failed to return the girls to Tara. Further, his appellate brief stated that "[n]o issue is raised challenging the charging instrument." Thus, he has both forfeited and affirmatively waived his opportunity to raise this argument on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued [in the opening brief] are waived and shall not be raised in the reply brief ***."). To the extent that his

reply brief could be read as advancing this prejudice/due process argument, we therefore do not consider it.

¶ 41     On appeal, Matthew has largely repackaged his argument. Instead of asserting prejudice from the language of the charging instruments, he now argues that the specific date identified in each count was an "essential element" of the offense.[1] Several of the errors he asserts on appeal spring from this contention. For instance, he argues that the evidence on count III was insufficient because the State did not show that his failure to return the children *on July 14, 2020,* was intentional. Similarly, he argues that the trial court wrongly admitted irrelevant evidence of other misconduct (*i.e.*, his actions on other days during the periods that he kept the children without legal justification). Matthew's fundamental premise for these arguments is mistaken, however, as the dates listed in the indictments were not essential elements of the charged offenses.

¶ 42     "[T]he prosecution need not prove the precise date alleged in an indictment if the date is not an essential element of the crime and the statute of limitations is not involved." *People v. Singer*, 2021 IL App (2d) 200314, ¶ 46. Here, there is no issue regarding limitations, so the only question is whether the date of July 14, 2020, was an essential element of the offense charged in count III.

---

[1] Matthew's opening brief did not expressly advance this essential-element argument, and thus we could find it forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). However, the argument serves as the unspoken premise of several of his other arguments. We thus exercise our discretion to address it here. *People v. Jackson*, 2020 IL 124112, ¶ 118 (reviewing courts may choose to look beyond considerations of forfeiture in the interest of justice).

"An 'essential' or 'material' element of a crime is one whose specification with precise accuracy is necessary to establish the very illegality of the behavior and thus the court's jurisdiction. *Only in rare cases is time a material element of the offense charged*, even where continuing offenses such as conspiracy are alleged." (Emphasis added.) *People v. Cina*, 699 F.2d 853, 859 (7th Cir. 1983).

¶ 43 Applying this standard, the date of July 14, 2020, was in no way necessary to establish the illegality of Matthew's retention of the girls beyond the expiration of his authorized parenting time with them, as charged in count III. As Matthew himself noted, all that was required for the State to prove its case on count III was for it to establish that, on that date, Matthew's visitation time had expired, Matthew knew that, and Matthew intentionally failed to return the children. Given that Matthew failed to return the children on *every* day from June 21 to September 25 (the period during which he wrongfully kept the children after the expiration of his Father's Day visit), the date in the indictment was of no legal significance: it was simply an example of a day on which Matthew engaged in child abduction as defined in section 10-5(b)(5) of the Code (720 ILCS 5/10-5(b)(5) (West 2018)). The date was not an essential element of the offense.

¶ 44 In his reply brief, Matthew argues that we must consider the date of July 14, 2020, to be an essential element of the offense charged in count III because he understood it to be essential when he prepared his defense, and treating the date as simply one day in a series of days on which he wrongfully withheld the children from Tara therefore prejudiced him. But prejudice is irrelevant to the determination of whether an allegation is an essential element: as we have explained, that inquiry focuses solely on whether the allegation is necessary to establish the illegality of the behavior. Indeed, Matthew cites no legal support for his argument, thereby forfeiting it. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (where a party does not offer any argument or meaningful

authority in support of that argument, the argument is forfeited). Further, to the extent that Matthew is arguing that the language of the indictment deprived him of due process, that argument is forfeited as well. See *supra* ¶ 41. We therefore reject Matthew's essential-element argument and turn to his remaining contentions about the sufficiency of the evidence on count III.

¶ 45    Count III charged that, as of July 14, 2020, Matthew had failed to return the children to Tara after the expiration of his parenting time that commenced on Father's Day, June 21, 2020. With respect to this count, Matthew argues that the State failed to prove that his parenting time had expired on July 14, pointing to his own testimony that Tara had agreed that he could keep the children until July 12, that it was Tara's fault that the children had not been returned to her on that day, and that Tara later texted him to ask him to return the children on July 17 or 20.

¶ 46    As to this last point, Tara's texts seeking to arrange for the children's return on July 17 or 20 were simply efforts to get her children back. They were not, in themselves, the legal equivalent of permission for Matthew to continue to keep the children, and Matthew has not cited any legal authority supporting such an equivalency. Matthew also did not produce any texts or other evidence to support his testimony that Tara agreed that he could keep the children in Minnesota from June 21 to July 12. The parenting plan did not give him the right to do so. Tara herself specifically denied that she ever agreed to allow Matthew to keep the children after Father's Day for any length of time, let alone three weeks, and Tara further denied that Matthew ever contacted her to make arrangements to return the children on a particular date.

¶ 47    Because the parties offered competing versions of the facts, the trial court was required to decide between them based on the evidence and the parties' credibility. It found that Tara was credible and Matthew was not, and that Matthew's parenting time on Father's Day expired that same day. We will not reweigh the evidence or substitute our judgment for that of the trial court,

which had a superior ability to observe the parties' demeanors as they testified. See *Collins*, 106 Ill. 2d at 261. Accordingly, we reject Matthew's arguments about the sufficiency of the evidence on count III, as well as on count I.

¶ 48                                    B. Barring the Defense from Recalling Meyer

¶ 49    Matthew next argues that the trial court erred by preventing him from recalling Meyer during the defense case in chief to give hearsay testimony about Tara's purported statement to Meyer about blocking Matthew's texts. He argues that (1) defense counsel adequately laid a foundation for Meyer's potentially impeaching testimony, and (2) the testimony would not have been hearsay because Tara's statements were admissions by a party opponent.[2]

¶ 50    We begin by identifying whether the statement was hearsay. Hearsay is an out-of-court statement that is offered to establish the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); *In re Estate of DeMarzo*, 2015 IL App (1st) 141766, ¶ 19. Hearsay is inadmissible unless the statement falls within a hearsay exception. Ill. R. Evid. 802 (eff. Jan. 1, 2011); *DeMarzo*, 2015 IL App (1st ) 141766, ¶ 19. Here, Meyer's potential testimony that Matthew sought to elicit was that Tara told Meyer that she had blocked Matthew's text messages. To the extent that Matthew sought to elicit this testimony to prove the truth of the matter asserted by the statement— that Tara did in fact block Matthew's texts—it would be inadmissible hearsay unless it fell within a hearsay exception.

---

[2] Matthew also argues in the alternative that, if the trial court's ruling was not error, his trial counsel rendered ineffective assistance of counsel by failing to obtain the admission of Meyer's testimony. We discuss this assertion along with Matthew's other claims of attorney ineffectiveness in section II.D below.

¶ 51    Matthew first contends that Meyer's testimony would not have been hearsay because it would have been admitted not to show that the statement was true (that is, to show that Tara in fact blocked Matthew's texts) but to impeach Tara's testimony with a prior inconsistent statement. The problem with this argument is that Meyer's potential testimony was solely about what Tara told him, not what Tara actually did. Meyer's testimony would not have impeached Tara's testimony, because Tara never testified (indeed, was never questioned) about whether she ever told anyone that she blocked Matthew's texts. The cases that Matthew cites in support of his argument actually demonstrate this: in each case where the court held that the testimony should have been permitted, the attorney had questioned the witness about whether he or she had made the statement in question. See *In re A.M.*, 274 Ill. App. 3d 702, 710 (1995); *People v. Nance*, 100 Ill. App. 3d 1117, 1120 (1981); *contrast People v. Smith*, 78 Ill. 2d 298, 304-05 (1980) (foundation requirement not met where attorney had not adequately alerted the declarant to the time, place, and circumstances of the statement in question); *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 137 (where attorney never asked declarant whether declarant told his uncle that he "did not want to lie anymore," statement could not be admitted as impeachment).

¶ 52    "Before a witness may be impeached by a prior inconsistent statement, it is required that a proper foundation have been established by directing the attention of the witness to the time, place and circumstances of the statement, as well as the substance of the statement in order to avoid unfair surprise and to give the witness an opportunity to explain." *Smith*, 78 Ill. 2d at 304-05. The trial court may properly prohibit the introduction of the declarant's prior statement if the statement is not inconsistent with the declarant's testimony at trial, or if an adequate foundation has not been laid. *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 80.

¶ 53    Matthew argues that his counsel did lay an adequate foundation for the admission of Meyer's testimony about Tara's statement to him, because Tara knew the time, place, and circumstances of the statement. But Matthew's cites to the record show only that Tara knew the time, place, and circumstances of a different matter: Matthew's failure to return the children on June 5. He presents no argument or record cites to show that Tara had been apprised of when and where she purportedly told Meyer that she blocked Matthew's texts, and our own review of the record does not disclose any such evidence. Thus, Matthew has not shown that he laid a proper foundation for the admission of Meyer's testimony as impeachment of Tara.

¶ 54    Matthew points out that the defense attempted to ask Tara on recross about her communications with Matthew "between June 5th and June 6th," but the State objected that it was beyond the scope of redirect and the trial court sustained the objection. Matthew argues that the trial court erred in doing so and this error prevented him from laying a proper foundation for Meyer's testimony about Tara's statement.

¶ 55    The State notes that Matthew forfeited this argument by failing to raise it in his posttrial motion. Matthew concedes this, but argues that the forfeiture should be excused because the trial court's ruling amounted to plain error. The plain error doctrine allows "a reviewing court to reach a forfeited error affecting substantial rights" in certain circumstances. *People v. Herron*, 215 Ill. 2d 167, 178 (2005). In order to successfully qualify for application of the plain error doctrine, a defendant must first show that the trial court committed a clear or obvious error. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010); *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). After meeting this threshold, the defendant must then show either that the evidence was closely balanced or that the error was so egregious as to deny the defendant a fair trial. *Hillier*, 237 Ill. 2d at 545. If the defendant cannot meet this burden, then the argument remains forfeited. *Id.*

¶ 56     In this case, the analysis founders on the first requirement: showing that the trial court committed a clear or obvious error. As the asserted error was an evidentiary ruling, the question is whether the trial court clearly or obviously abused its discretion in barring the inquiry at issue. See *People v. Terrell*, 185 Ill. 2d 467, 498 (1998) (trial court's ruling on scope objection "should not be disturbed unless it is a clear abuse of discretion which results in manifest prejudice to [a] defendant").

¶ 57     Matthew argues that defense counsel's question was an attempt "to draw Tara's attention to the substance of her prior inconsistent statement," but this simply is not so. Matthew confuses questioning Tara about her communications *with Matthew* during the period from June 5 through June 8, 2020, with questioning her about her statements *to Meyer*. Laying a foundation for the introduction of Meyer's impeaching testimony required the latter. The question that the trial court barred was about the former, not the latter.

¶ 58     Although cross-examination is generally limited in scope to the subject matter of direct examination of the witness, "this limitation is construed liberally to allow inquiry into whatever subject tends to explain, discredit, or destroy the witness' direct testimony." *Id.* Thus, defense counsel could have questioned Tara about her conversations with Meyer and whether she told him that she blocked Matthew's texts, thereby laying a foundation for the introduction of Meyer's testimony about her statement to him. Instead, defense counsel attempted to question her only about her communications with Matthew, an area that did nothing to lay the necessary foundation. Matthew has not shown that the trial court's ruling restricted his ability to introduce evidence of Tara's purported prior inconsistent statement. Thus, it was not a clear abuse of discretion that resulted in "manifest prejudice" to Matthew. *Id.*

¶ 59    Matthew also argues that, even if his attorney did not lay the proper foundation, Tara's purported statement to Meyer was not hearsay because it was a statement by a party opponent. Illinois Rule of Evidence 801(d)(2) (eff. Oct. 15, 2015) provides that a statement made by a party is not hearsay if it is offered in evidence against that party. Here, however, Tara is not a party to the case. The cases cited by Matthew are distinguishable because they involve statements made by the defendants themselves—persons who are undoubtedly parties to their criminal cases. Although Tara was an important witness for the State, she herself was not the State, nor was she an agent of the State. Thus, Rule 801(d)(2) does not apply here. As no hearsay exception applied to Meyer's proffered testimony, the trial court did not err by preventing Matthew from recalling Meyer. See Ill. R. Evid. 802 (eff. Jan. 1, 2011); *Lopez*, 2012 IL App (1st) 101395, ¶ 80.

¶ 60                              C. Evidence of "Other Crimes"

¶ 61    Matthew next contends that the trial court improperly permitted the State to introduce "other crimes" evidence of events occurring outside the dates listed in the charges (June 5 and July 14, 2020) that was irrelevant and highly prejudicial. The State responds that the evidence it introduced relating to events during the two holdover periods (March 29 to June 8, 2020, and June 21 to September 26, 2020) was not other-crimes evidence at all, as it was relevant to show Matthew's commission of the charged offenses (failing to return the children after the expiration of parenting time). In the alternative, it argues that, even if the evidence was other-crimes evidence, it was properly admitted to show the intentional nature of Matthew's actions. The State also asserts that, as Matthew did not raise this argument in his posttrial motion, he has forfeited it unless he can show plain error.

¶ 62    Matthew begins by citing the bedrock due process principle that a defendant must receive a fair trial. Toward that goal, the fact finder's determination of guilt must be based on relevant,

admissible evidence, "uninfluenced by bias or prejudice raised by irrelevant evidence." *People v. King*, 2020 IL 123926, ¶ 43 (citing *People v. Bernette*, 30 Ill. 2d 359, 371 (1964)). Relevant evidence is evidence that has "any tendency to make the existence of any fact *** of consequence *** more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Relevant evidence is generally admissible, while irrelevant evidence is not. Ill. R. Evid. 402 (eff. Jan. 1, 2011). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice" or other concerns. Ill. R. Evid. 403 (eff. Jan. 1, 2011). Weighing whether evidence is unfairly prejudicial requires an evaluation of "the capacity of [the] evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged" (*People v. Chromik*, 408 Ill. App. 3d 1028, 1042 (2011)), "such as sympathy, hatred, contempt or horror" (internal quotation marks omitted) (*People v. Eyler*, 133 Ill. 2d 173, 218 (1989)).

¶ 63     Special considerations govern the admission of evidence about a party's character, including his or her commission of other crimes or bad acts. Such evidence generally cannot be admitted as "propensity evidence," *i.e.*, proof that, on the occasion at issue, the defendant acted in conformity with his or her prior bad acts. See Ill. R. Evid. 404 (eff. Jan. 1, 2011). However, this kind of evidence *can* be admitted to prove other matters, including the defendant's intent, plan, and lack of mistake or accident. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011).

¶ 64     Matthew contends that the State violated these principles in two ways. First, he complains that any evidence that he wrongfully kept the children on any dates outside of those listed in the indictments (*i.e.*, June 5 and July 14, 2020) was irrelevant, because those two dates were essential elements of his charges. We reject this argument for the reasons previously stated.

¶ 65    Matthew also complains about the admission of "other bad acts" evidence that he contends was completely irrelevant to the question of his guilt or innocence, on grounds apart from the dates on which those acts occurred. He points to Tara's testimony that she did not see her children for months on end and was rarely able to talk with them over the phone during that time, and that the children missed many days of school during that time. He contends that this evidence was irrelevant and was intended only to arouse sympathy for Tara and paint him as a villain in the eyes of the court.

¶ 66    Matthew asserts that he preserved this issue for appeal, but our review of the record shows that Matthew never objected to the introduction of this testimony by Tara and never argued in his posttrial motion that it constituted "other bad acts" testimony. Thus, he has forfeited the issue unless he can show that it rose to the level of plain error. *Herron*, 215 Ill. 2d at 178.

¶ 67    We begin with Tara's testimony that she was unable to see her children or speak regularly with them during Matthew's wrongful holdovers. That evidence was not irrelevant to the charged offenses. It was relevant because it shed light on whether Tara consented to those holdovers. See Ill. R. Evid. 401 (eff. Jan. 1, 2011) (relevant evidence is evidence that makes the existence of any material fact more probable or less probable). Matthew contended at trial that Tara agreed to allow him to keep the children after both the spring break visit (because of the difficulties posed by COVID-19) and the Father's Day visit (so that Matthew could have the first three weeks of the summer as his summer visit). Evidence that Tara saw or freely communicated with the children during the holdovers would have been relevant to support Matthew's version of events. By the same token, evidence that Tara did not see and rarely was able to speak with her children supported her testimony that she did not agree to the holdovers. As that evidence was relevant and not unduly prejudicial (that is, the focus remained on whether Matthew knowingly and without Tara's consent

kept the children after the expiration of scheduled visits), its admission was not error. Ill. R. Evid. 402, 404(b) (eff. Jan. 1, 2011). Matthew has not shown the existence of any error, and thus he cannot show plain error. *Hillier*, 237 Ill. 2d at 545.

¶ 68    By contrast, the remaining testimony that Matthew complains of—Tara's testimony that Matthew's conduct caused the girls to miss school—was not directly relevant to the issue of his guilt or innocence of the charges. Thus, its probative value was minimal. However, its prejudicial impact was also low. It is a matter of public record that Illinois schools were closed to in-person instruction from April to June 2020, and most of the remainder of the holdovers took place during the summer months when school likewise was not in session. Against this background, the potential negative impact of Tara's statements about school attendance was limited.

¶ 69    Trial courts are presumed to be familiar with and to follow the law. When a case is tried before a judge rather than before a jury, a reviewing court "presumes that the trial court considered only admissible evidence and disregarded inadmissible evidence in reaching its conclusion." *People v. Naylor*, 229 Ill. 2d 584, 603 (2008). This presumption "may be rebutted where the record affirmatively shows the contrary." *People v. Gilbert*, 68 Ill. 2d 252, 258-59 (1977). No such grounds to rebut the presumption exist here.

¶ 70    Although Matthew argues that the trial court considered and was influenced by this improper evidence that he caused the children to miss school, the record fails to support his assertion. The trial court made no mention whatsoever of this testimony either when summarizing the evidence or at any other point. To the contrary, it explicitly based its credibility determinations on Matthew's evasive and untruthful manner when testifying. As the record does not affirmatively show that the trial court gave any weight to Tara's testimony about the girls missing school, we must presume that the trial court did not consider it. *Naylor*, 229 Ill. 2d at 603. Matthew has not

shown plain error, let alone reversible error. For all of these reasons, we reject Matthew's arguments on this point.

¶ 71                                    D. Ineffective Assistance of Counsel

¶ 72    Matthew's final claim is that his trial counsel was ineffective in a variety of ways: by failing to lay a proper foundation for the admission of Meyer's impeachment testimony regarding whether Tara told him that she blocked Matthew's texts, by failing to object to the admission of the "other bad acts" evidence through objections at trial and raising the issue in his posttrial motion, and by failing to impeach Tara with evidence not adduced until the sentencing hearing.

¶ 73    Under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant arguing ineffective assistance of counsel must show not only that his or her counsel's performance was deficient but also that the defendant suffered prejudice as a result. *People v. Houston*, 226 Ill. 2d 135, 143 (2007). Specifically, under the two-prong *Strickland* test, "a defendant must show that (1) his counsel's performance *** fell below an objective standard of reasonableness, and (2) *** but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *Id.* at 144. Because a defendant must satisfy both prongs of the *Strickland* test, the failure to establish either is fatal to the claim. *Strickland*, 466 U.S. at 687.

¶ 74    As to counsel's failure to lay a foundation for the admission of Meyer's testimony, Matthew cannot show prejudice, *i.e.*, that there is a reasonable probability that he would have been acquitted had that evidence been presented. At most, Meyer's testimony could have damaged Tara's credibility, showing that, although she testified that she did not block Matthew's texts, she told Meyer that she did block his texts. But the evidence on which Matthew's convictions rested was largely undisputed: Matthew acknowledged that the parenting plan did not allow him to keep the children beyond the end of spring break or after 5 p.m. on Father's Day and that the court order

dated June 4, 2020, required him to return the children immediately, yet he failed to return the children. He argued that his failure to return them was not intentional, but he offered no evidence that he was unable to return them. As discussed earlier, Matthew had the capability to return the children on any number of occasions but did not do so. The evidence that he intentionally failed to return them was overwhelming. There was no reasonable probability that the outcome of the trial would have been different if counsel had laid a proper foundation for Meyer's hearsay testimony, and thus counsel's failure to do so did not rise to the level of prejudice needed to show ineffective assistance of counsel. *Houston*, 226 Ill. 2d at 144.

¶ 75    Similarly, the failure of Matthew's counsel to object to the admission of the other-bad-acts evidence was not deficient representation and did not prejudice the outcome of the case. As we explained above, most of that evidence was in fact relevant and admissible, so any objection would have been fruitless. See *People v. Walker*, 2021 IL App (4th) 190073, ¶ 30 ("counsel cannot be found deficient for failing to object to relevant admissible testimony"). The admission of the only irrelevant evidence—Tara's testimony about the children missing school—was harmless, given the presumption that the trial court considered only admissible evidence in reaching its decision. *Naylor*, 229 Ill. 2d at 603.

¶ 76    The final basis for Matthew's claim of ineffective assistance is his counsel's failure to introduce at trial the same evidence that was introduced at his sentencing hearing, including one daughter's testimony that (contrary to Tara's testimony) she talked with Tara often and the girls attended school online during the time that they were living with Matthew, and evidence that Tara's drinking had caused serious problems for her, including Department of Children and Family Services proceedings. However, the record does not show whether, prior to trial, Matthew had told

his trial counsel about any of this potential evidence, or establish that counsel had any reason to inquire into whether such evidence existed.

¶ 77 When the record is incomplete or insufficient to resolve a claim that trial counsel provided ineffective assistance, such claims may be better suited for resolution in a collateral proceeding such as a petition brought under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)). *People v. Veach*, 2017 IL 120649, ¶ 46; *People v. Bew*, 228 Ill. 2d 122, 135 (2008). In a collateral proceeding, the parties have an opportunity to submit evidence and develop a record regarding counsel's actions and inactions and the reasons for his or her decisions. And, although the failure to raise a claim on direct appeal can result in forfeiture of that claim, a defendant is not precluded "from raising an issue on collateral review that depend[s] upon facts not found in the record." *Veach*, 2017 IL 120649, ¶ 47. Here, the record is not sufficiently developed to allow us to resolve this ineffective-assistance argument. Thus, we decline to consider it. Matthew may, if he chooses, raise this argument in a postconviction petition.

¶ 78 Matthew also argues that, even if the record is inadequate to resolve most of his arguments about the evidence presented at sentencing but not at trial, there was one item of evidence related to Tara's drinking (her text on July 12, 2020, saying "Omg drank… don't know anything anymore") that his trial counsel clearly knew of prior to trial. The content of this text was brought out at trial by counsel in opening and closing arguments, as well as via Matthew's testimony about the text and its meaning. Matthew now contends that counsel also should have confronted Tara on cross-examination about the text and her drinking. However, this is a matter of trial strategy. When claiming ineffective assistance of counsel, a defendant must overcome a strong presumption that, under the circumstances of the case, counsel's actions or inactions constituted sound strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). To prove otherwise, a party must show that

counsel's decision was so irrational and unreasonable that no reasonably effective attorney, facing like circumstances, would pursue such a strategy. *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82. Here, counsel may have believed that confronting Tara with her text and her drinking would simply allow Tara an opportunity to explain away the words of her text or cast her drinking in a more favorable light. Matthew has not shown otherwise, and the record does not show why counsel did not cross-examine Tara about her drinking. On the current record, we cannot say whether this approach was reasonable or not. As the record is inadequate to resolve this argument, we do not address it on direct appeal. *Veach*, 2017 IL 120649, ¶ 47.

¶ 79    To the extent that we have considered them here, we reject Matthew's claims of ineffective assistance of counsel. To the extent that we have not considered such claims here, Matthew is not precluded from raising them in a collateral proceeding if he wishes. *Id.*

¶ 80                                   III. CONCLUSION

¶ 81    For the reasons stated, the appeal is dismissed as to count II. The judgment of the circuit court of Kendall County as to counts I and III is affirmed.

¶ 82    Appeal dismissed in part and affirmed in part.

¶ 83    PRESIDING JUSTICE McLAREN, specially concurring:

¶ 84    I specially concur because I wish to emphasize a point regarding the claim of error regarding the alleged blocking of text messages. The parties were to communicate *either* by text messages or e-mails. Matthew addresses only the text messages and not the e-mails. I submit that in order to establish error he must also allege and prove that *all* methods of communication were inaccessible to him. If not, it is an incomplete defense that fails.

¶ 85    Matthew cannot establish the defense of impaired compliance based on whether he was able to return the children on his terms; the question rather is whether he was able to return the

children in compliance with the court order. Matthew failed to do so and he has failed to present a complete defense regarding the alleged blockage of communications. Ergo, his claims of ineffective assistance of counsel, and him being prevented from returning the children posthaste, are based on an incomplete defense that fails to establish error.

***People v. Brennan*, 2023 IL App (2d) 220190**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kendall County, No. 20-CF-198; the Hon. Robert P. Pilmer, Judge, presiding. |
| **Attorneys for Appellant:** | DePaul University Legal Clinic, of Chicago (Elizabeth Botti, of counsel, and  Luis Guerrero, Maxwell Busby, Andrew Goldbert, Grace Murphy, and Noelle DeLorme, law students), for appellant. |
| **Attorneys for Appellee:** | Eric C. Weis, State's Attorney, of Yorkville (Patrick Delfino, Edward R. Psenicka, and Victoria E. Jozef, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |